**PUERTO RICO AQUEDUCT AND SEWER AUTHORITY,**
Plaintiff, Appellant,

v.

**CONSTRUCTORA LLUCH, INC., and CNA Casualty of Puerto Rico, Inc.,**
Defendants, Appellees.

No. 98–1331.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1998.

Decided Feb. 18, 1999.

Carlos A. Rodríguez–Vidal, with whom Goldman Antonetti & Córdova was on brief, for appellant.

José M. Biaggi–Junquera, with whom José Enrique Otero was on joint brief, for appellees.

Before TORRUELLA, Chief Judge, HALL,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

TORRUELLA, Chief Judge.

Before the Court is plaintiff-appellant Puerto Rico Aqueduct and Sewer Authority's ("PRASA") appeal from the district court's denial of PRASA's motion for a second partial new trial on damages. At the first partial new trial, the jury awarded PRASA no damages despite an earlier verdict finding defendant-appellee Constructora Lluch, Inc. ("Lluch") to be negligent and in breach of the construction contract between the two. PRASA also appeals from a jury award on Lluch's counterclaims against PRASA for

* Of the Ninth Circuit, sitting by designation.

breach of contract and for amounts owed on the contract. For the reasons stated in this opinion, we affirm the judgment awarding Lluch $756,471.59 on its counterclaims, but vacate the judgment awarding PRASA no damages on its claims and remand for a second partial new trial on the issue of damages.

## BACKGROUND

This case arises out of the collapse, during construction, of the steel roof structure of the Mayaguez Composting Facility in October of 1989. PRASA entertained bids for the project and eventually awarded the project's design to Lebrón Associates, an engineering and architecture firm. In May of 1988, PRASA entered into a construction contract with Lluch to build the facility. Several months later, Lluch subcontracted with Richmond Steel, Inc. ("RSI") to manufacture and install the facility's steel components, including the roof.

The Mayaguez facility was to be a compost treatment plant comprised of a main building to deposit and treat compost and a separate administrative building. The main building was designed as two adjacent bays with three lines of columns to support two separate steel frame roofs. Among the plans and specifications developed by Lebrón was a procedure to be followed for the preparation and consolidation of the soil. Under the procedure, Lluch was required: (1) to place a permanent landfill on the site; (2) to install wicks and pertinent instrumentation; (3) to place a surcharge[1] on the site; and (4) to leave the surcharge undisturbed for a period of seven and a half months. However, before the consolidation of the soil was completed, Lluch removed the surcharge from the soil in order to begin the concrete construction and in order to allow RSI to begin the steel erection.

On October 22, 1989, after RSI had erected a substantial part of the east portion of

the steel roof structure, the uncompleted west portion of the steel roof structure collapsed. After the collapse, Lluch removed the collapsed steel frames and debris, began to repair the damaged columns, and continued with construction of the remaining phases of the project, all with PRASA's authorization and under PRASA's supervision. After Lluch had substantially completed the construction of the project—with the exception of the steel roof structure—PRASA demolished the entire project, over Lluch's objection.

On October 10, 1990, this action was filed in United States District Court for the District of Puerto Rico by RSI, seeking monetary and declaratory relief against PRASA, Lluch, Lebrón, and their bonding and surety companies. Several counterclaims, cross-claims, and third-party claims followed, most of which were dismissed before trial. Included in those rulings, the district court dismissed PRASA's cross-claim under Article 1483 of the Puerto Rico Civil Code against Lluch and RSI. See *Richmond Steel, Inc. v. Legal and Gen. Assurance Soc'y, Ltd.*, 825 F.Supp. 443, 445 (D.P.R.1993).

At the first trial in 1993, some of the parties entered into various stipulations, including the dismissal of original plaintiff RSI. The district court then realigned the parties to continue the trial. As a result, PRASA became the plaintiff, and Lluch, Lebrón, and CNA Casualty of Puerto Rico, Inc. ("CNA")[2] remained as defendants. On August 9, 1993, after a twenty-four day trial, the jury, in a special verdict form, found: (1) that Lluch improperly removed the surcharge from the construction site or in some other way breached its contract with PRASA by negligent construction work; (2) that this breach caused the collapse of the roof structure; (3) that this breach caused damages to PRASA; (4) that PRASA's demolition of the remains of the structure was unjustified; and (5) that PRASA suffered $4,587,202.77 in damages as

---

1. To surcharge soil on a site is to place an eight-foot thick layer of additional dirt on the site in order to put pressure on the soil. This strengthens the soil by forcing additional water out from underneath, thus minimizing any later soil settlement.

2. CNA was named in the claims against Lluch only as Lluch's insurer. As Lluch's insurer, CNA joined Lluch in defending against PRASA's claims and now joins Lluch as an appellee in the present appeal.

a result of Lluch's breach. With regard to the counterclaims against PRASA, the jury found: (1) that PRASA breached its contract with Lluch; (2) that this breach caused damages to Lluch in the amount of $138,758; (3) that PRASA owed Lluch $617,713.59 for work performed on the contract; and (4) that PRASA owed Lebrón $40,148.28 on the contract. As a result of these findings, the jury awarded: (1) $4,587,202.77 to PRASA for Lluch's negligence and breach of contract; (2) $756,471.59 to Lluch on its counterclaims against PRASA for breach of contract and money owed on the contract; and (3) $40,-148.28 to Lebrón on its counterclaim against PRASA for money owed on the contract.

On October 15, 1993, the district court issued a judgment consistent with the damages awarded by the jury. In an order issued the same day, the district court advised counsel that all post-trial motions were required to be filed or renewed within 10 days of the date of the judgment. On October 21, 1993, CNA and Lluch filed a timely motion for a new trial on PRASA's claims. On November 4, 1993—twenty days after the entry of judgment—PRASA filed a motion for judgment as a matter of law with regard to Lluch's counterclaims.

On July 27, 1994, the court granted CNA and Lluch's motion for a new trial, subject to PRASA's acceptance of a remittitur. The court concluded that the jury award was excessive in light of the evidence presented. The court then gave PRASA the option of accepting a remitted award of $1,224,000 or a partial new trial on damages. PRASA opted for a new trial.

On March 24, 1995, the court denied PRASA's motion for judgment as a matter of law on Lluch's counterclaims. The court found that the evidence was sufficient to allow a reasonable jury to reach a verdict in favor of Lluch on those claims.

On February 7, 1996, the court set the scope of the partial new trial on damages for PRASA's claims. The court held that the new trial would be limited only to the extent of PRASA's damages at the time of the collapse. The court concluded that, because the jury in the first trial found that PRASA was unjustified in demolishing the structure, damages would be limited to the cost to repair the collapse as of October 22, 1989, the date of the collapse.

At the partial new trial, PRASA presented evidence that the soil conditions at the site were unstable and were experiencing settlement beyond what was expected. PRASA's experts testified that the soil had to be improved in order to repair the collapse, either through placing a new surcharge on the site or by installing piles to support the structure. PRASA's experts testified that only the option of installing piles was feasible, but that it would cost in excess of $6 million to do. Lluch and CNA presented testimony that the soil did not have to be improved to repair the collapse and that it would have cost approximately $500,000 to repair the damage. Lluch and CNA also presented testimony that Lluch intended to absorb the costs of repair and that PRASA was never going to be charged for those costs.

The court instructed the jury: (1) that PRASA was entitled to claim the extent of any damages it suffered at the time of the collapse on October 22, 1989; and (2) that those damages were limited to the cost to repair the collapse. The court also instructed the jury to accept as established facts: (1) that Lluch improperly removed the surcharge or breached its contract in some other way by negligent construction; (2) that this breach or negligence caused the collapse; and (3) that PRASA's subsequent demolition of the structure was unjustified. The court informed the jury that if PRASA failed to establish the amount of damages caused by Lluch, then PRASA was not entitled to collect any damages. The court then submitted a verdict form to the jury that asked whether PRASA suffered any damages, and if so, the amount of those damages.

On July 15, 1997, the jury returned the verdict form indicating that it found that PRASA suffered no damages. Judgment was entered the next day, ordering that PRASA take nothing from Lluch and CNA.

On August 1, 1997, PRASA filed a motion for a second partial new trial on the issue of damages or for reinstatement of the 1993 verdict. On December 11, 1997, the court

entered an Opinion and Order denying PRASA's motion. On December 22, 1997, PRASA filed a motion to alter or amend the December 11, 1997 Opinion and Order. On January 22, 1998, the court denied PRASA's motion to alter or amend by Endorsed Order. The Court photocopied the motion, wrote "Denied" in the margin of the photocopy, and referred the parties to the December 11, 1997 Opinion and Order. On January 27, 1998, PRASA filed a notice of appeal from the July 16, 1997 judgment, the December 11, 1997 Opinion and Order, and the January 22, 1998 Endorsed Order.

## DISCUSSION

### I. Jurisdiction

Before we reach the merits, we must first address appellees' contention that we lack jurisdiction over PRASA's appeal. The docket reflects the following chain of relevant events:

- July 16, 1997—The district court entered judgment awarding no damages to PRASA;
- August 1, 1997—PRASA filed a Rule 59(b) motion for a second partial new trial on damages or for reinstatement of the prior verdict;
- December 11, 1997—The district court entered an Opinion and Order denying PRASA's motion for a second partial new trial on damages;
- December 22, 1997—PRASA filed a motion to alter or amend the December 11, 1997 Opinion and Order;
- January 22, 1998—The district court denied PRASA's motion to alter or amend by entering an Endorsed Order. The Endorsed Order consisted of a photocopy of PRASA's motion to alter or amend, with a notation in the margin signed by the district judge. The notation stated: "Denied. *See* docket no. 624." Docket No. 624 is the court's December 11, 1997 Opinion and Order;
- January 27, 1998—PRASA filed its notice of appeal from the July 16, 1997 judgment, the December 11, 1997 Opinion and Order, and the January 22, 1998 Endorsed Order.

Appellees argue that appellate jurisdiction is lacking because PRASA's December 22, 1997 motion to alter or amend the December 11, 1997 Opinion and Order did not toll the time to appeal the judgment or the Opinion and Order. Federal Rule of Appellate Procedure 4(a)(4)(C) provides that the filing of a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) tolls the time for appeal until the district court issues an order disposing of the motion. Appellees claim that PRASA's motion is not really a motion to alter or amend the December 11, 1997 Opinion and Order because it requested the same relief sought by the motion for a second partial new trial, and did so on the same grounds. Appellees argue that PRASA's motion to alter or amend is really a motion to reconsider the July 16, 1997 judgment. Appellees point out that the motion to alter or amend is, in some places, an exact verbatim copy of the motion for a new trial. Appellees further claim that even the non-verbatim portions merely recast the arguments of the motion for a new trial with the addition of quotations from the trial transcript.

Appellees correctly note that the filing of a motion to reconsider will only toll the time for appeal if the motion is filed no later than ten days after the entry of the judgment from which reconsideration is sought. *See* Fed. R.App. P. 4(a)(4)(F). Appellees claim that since PRASA's December 22, 1997 motion is really a motion to reconsider the July 16, 1997 judgment, it needed to be filed within ten days of July 16, 1997 to have any effect on the time to appeal. In support of this position, appellees cite *Acevedo–Villalobos v. Hernández,* 22 F.3d 384 (1st Cir.), *cert. denied,* 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 490 (1994). In *Acevedo–Villalobos,* the Court was faced with a situation in which the district court entered a judgment of dismissal and the plaintiffs filed one post-judgment motion within 10 days of the judgment and another post-judgment motion more than 10 days from the entry of judgment. *See id.* at 389–90. Even though the second motion purported to request reconsideration of the denial of the first motion, the Court found that the second motion was "an obvious at-

tempt to have the district court revisit the legal basis for" the original judgment of dismissal. *Id.* at 390. The Court noted that the second motion requested the same relief that the first motion requested, and did so on the same grounds. *See .id.* Therefore, the Court treated the second motion as a motion to reconsider the original judgment of dismissal. *See id.* Because the second motion was untimely as such a motion to reconsider, the Court found: (1) that it did not extend the tolling of the time to appeal the original judgment of dismissal; and (2) that it did not toll the time to appeal the denial of the first post-judgment motion. *See id.*

Appellees' argue that the same result should follow in the present case because the December 22, 1997 motion is really a motion to reconsider the July 16, 1997 judgment and because the motion was filed over five months after the July 16, 1997 judgment. From this, appellees argue: (1) that the time to appeal the July 16, 1997 judgment was tolled only by the filing of the Rule 59(b) motion for a second partial new trial and therefore expired on January 11, 1998; (2) that the time to appeal the December 11, 1997 Opinion and Order was never tolled and also expired on January 11, 1998; and (3) that there was no time to appeal the January 22, 1998 Order, because the untimeliness of the motion to reconsider deprived the district court of jurisdiction to decide it.

■ We cannot accept appellees' contentions. We are faced with a different situation than that presented in *Acevedo–Villalobos.* In that case, the Court found that the tolling terminated with the denial of the first post-judgment motion. *See Acevedo–Villalobos,* 22 F.3d at 390. In the present case, however, the December 11, 1997 Opinion and Order—the order denying PRASA's first post-judgment motion—did not stop the tolling of the time to appeal the July 16, 1997 judgment because, as discussed below, it was not a "final judgment" in compliance with the "separate document" rule of Federal Rule of Civil Procedure 58.

■ Federal Rule of Appellate Procedure 4(a)(4) provides that the tolling commenced by the filing of a proper post-judgment motion continues until "the entry of the order

disposing of the last such motion outstanding." Fed. R.App. P. 4(a)(4). Subsection (a)(7) states that "a judgment or order is entered within the meaning of this Rule 4(a) when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure." Fed. R.App. P. 4(a)(7). Therefore, in order to halt the tolling of the time to appeal, an order denying a tolling post-judgment motion must comply with Rule 58. *See also Kersey v. Dennison Mfg. Co.,* 3 F.3d 482, 484–85 (1st Cir.1993) (finding that the tolling of the time to appeal from a certified judgment never stopped because, even though the district court "announced" its denial of a tolling post-judgment Rule 59(e) motion in an order, it never issued a separate document); *Fiore v. Washington Cty. Com. Mental Health Ctr.,* 960 F.2d 229, 233 (1st Cir.1992)(en banc)(noting Rules 4(a)(4) and 4(a)(7) and stating that those subsections expressly impose Rule 58's separate document requirement on denials of post-judgment motions that toll the time for appeal). Because we find below that the December 11, 1997 Opinion and Order did not comply with Rule 58, we find that it did not stop the tolling of the time to appeal the July 16, 1997 judgment.

Rule 58 states that "[e]very judgment shall be set forth on a separate document" and that "[a] judgment is only effective when so set forth." Fed.R.Civ.P. 58. In *Fiore v. Washington Cty. Com. Mental Health Ctr.,* this Court held that Rule 58 shall be applied to all final orders denying and granting post-judgment motions under Rules 50(b), 59(b), 59(e), and 60(b). *See Fiore,* 960 F.2d at 232–33; *see also Credit Francais Int'l, S.A. v. Bio–Vita, Ltd.,* 78 F.3d 698, 704 n. 12 (1st Cir.1996) ("[T]he 'separate document' rule does apply to orders denying Rule 59(e) motions."). In doing so, the *Fiore* Court concluded that "technical compliance with the [separate document requirement] is as necessary in the post-judgment context as it is in disposing of the merits." *Fiore,* 960 F.2d at 235. Because PRASA's motion for a second partial new trial was a Rule 59(b) motion, it fits within *Fiore*'s "uniform approach for all orders denying post-judgment motions under Rules 50(b), 52(b) and 59(b) and (e), as well

as under Rule 60(b)." *Id.* at 232. Thus, the Opinion and Order denying PRASA's motion for a second partial new trial must comply with Rule 58.

The December 11, 1997 Opinion and Order was a five-page opinion which considered PRASA's motion for a second partial new trial. In the Opinion and Order, the district court addressed and rejected each of PRASA's arguments in turn, using explanatory language to give its reason for each rejection. The Opinion and Order concluded with the following statements: "Accordingly, the Court hereby **denies** the motion for a new trial. **IT IS SO ORDERED.**"

Appellees argue that the Opinion and Order, by itself, was a separate document, as contemplated by Rule 58. Appellees claim that the Opinion and Order was originated by the district court as a separate piece of paper and that the Opinion and Order discussed the merits of PRASA's motion for a new trial. Appellees further claim that there was no margin for confusion or uncertainty as to the finality of the order. Appellees cite *Hollywood v. City of Santa Maria,* 886 F.2d 1228, 1231 (9th Cir.1989), for its holding that a separate document was not required to accompany a nine-page order denying a Rule 59 motion for a new trial. In that case, the Ninth Circuit noted that it had previously held that compliance with Rule 58 "requires entry of a document distinct from any opinion or memorandum." *Id.* at 1231 (citing *Allah v. Superior Court,* 871 F.2d 887, 890 (9th Cir.1989); *Vernon v. Heckler,* 811 F.2d 1274, 1276 (9th Cir.1987)). The *Hollywood* court then refused to extend this rule to the context of orders denying Rule 59 motions. *See id.* The court found that the risk of confusion regarding finality does not exist in the context of denials of Rule 59 motions for a new trial. *See id.* at 1232. The court held that the order denying the Rule 59 motion "definitively signaled the end of the litigation." *Id.*

In relying on *Hollywood,* appellees make an argument directly at odds with this Court's holding in *Fiore.* In *Fiore,* the Court held that "technical compliance with the [separate document requirement] is as necessary in the post-judgment context as it is in disposing of the merits." *Fiore,* 960 F.2d at 235. The Court recognized that the uncertainty that prompted the separate document rule would be less likely to occur with respect to post-judgment orders than for initial judgments. *See id.* at 234. Nonetheless, the Court stated that, because some uncertainty will always exist, consistency and clarity would be better achieved by following the rules as written than by trying to distinguish one type of judgment or order from another. *See id.* In footnote 9, the Court stated that *Hollywood* was "at odds with our conclusion that post-judgment motions should be treated identically with judgments on the merits." *Id.* at 235 n. 9. Therefore, appellees' reliance on *Hollywood* is misplaced; we are bound by *Fiore*'s holding that orders denying Rule 59(b) motions are subject to the separate document requirement of Rule 58.

Appellees cannot escape the fact that the December 11, 1997 Opinion and Order was a five-page explanatory opinion denying PRASA's motion that was not accompanied by a separate one-line judgment. This does not comply with the separate document requirement of Rule 58. Several courts have found that detailed opinions similar to the December 11, 1997 Opinion and Order violate the separate document requirement because they were not accompanied by a short separate judgment. *See, e.g., Baker v. Mercedes Benz of North America,* 114 F.3d 57, 60 (5th Cir. 1997) (holding that Rule 58 was not satisfied by an extensive written opinion concluding with the sentence: "This is a final judgment", because there was no separate document judgment); *Barber v. Whirlpool Corp.,* 34 F.3d 1268, 1275 (4th Cir.1994)(holding that an eleven-page order setting forth findings of fact and conclusions of law and dismissing defendant's post-trial motions did not satisfy the separate document rule); *Clough v. Rush,* 959 F.2d 182, 184–85 (10th Cir.1992) (holding that the absence of a separate document rendered an order nonfinal, even though the order granting summary judgment was fifteen pages long and contained detailed legal reasoning). We recognize the irony in finding that an Opinion and Order is not an effectively final judgment because it contains pages of explanatory language and

reasoning. However, this Court's concerns for certainty and predictability in *Fiore* gave rise to a uniform rule of technical compliance. Consequently, we find that the December 11, 1997 Opinion and Order did not comply with the separate document requirement of Rule 58. Therefore, the December 11, 1997 Opinion and Order did not stop the tolling of the time to appeal the July 16, 1997 judgment.

█ Even though the December 11, 1997 Opinion and Order was not a final judgment in compliance with the separate document requirement of Rule 58, we nevertheless have jurisdiction over the appeal if the parties are found to have waived the separate document requirement. In *Bankers Trust v. Mallis*, 435 U.S. 381, 386, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), the Supreme Court stated that judicial efficiency requires that the parties be able to waive the separate document requirement in order to avoid the pointless exercise of dismissing the appeal only to have it refiled when the district court enters the required separate document. The Court then went on to find waiver in that case because the petitioner (who was the appellee at the circuit level) did not object to the taking of the appeal in the absence of a separate judgment. *See id.* at 387–88, 98 S.Ct. 1117. We have previously applied this waiver principle "where both parties waive the requirement and neither party would be prejudiced or misled by the lack of a separate document." *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 926 F.2d 92, 96 (1st Cir.1991); *see also Smith v. Massachusetts Dep't of Correction*, 936 F.2d 1390, 1394 (1st Cir.1991). We have also stated that "the separate document requirement should always be interpreted to prevent the loss of the right to appeal, not to facilitate loss." *Fiore*, 960 F.2d at 236–37 (internal quotation marks omitted).

In the present case, both PRASA and appellees have waived the separate document requirement. PRASA clearly waived the requirement when it filed its notice of appeal in the absence of a true final judgment. *See id.* at 236 n. 10. Appellees waived the requirement by failing to object at any point to the taking of an appeal in the absence of a separate document. To date, appellees have never claimed that no separate document has issued or that this appeal may not proceed because no separate document has issued. Appellees moved to dismiss the appeal for lack of jurisdiction, but this motion claimed that the January 27, 1998 notice of appeal was untimely, an argument which is predicated on the validity and finality of the December 11, 1997 Opinion and Order. Appellees did not raise the separate document issue in any form until the Court denied the motion to dismiss the appeal and specifically inquired about compliance with the separate document rule. Appellees' current position is that the Opinion and Order is a separate document and therefore the notice of appeal was untimely, so appellees do not, even today, object to the taking of an appeal in the absence of a separate document.

Nor does it appear that either PRASA or appellees have been prejudiced or misled by the lack of a separate document. Appellees apparently did not even suspect that the December 11, 1997 Opinion and Order was insufficient until the Court's request for briefing on the issue. PRASA was not prejudiced or misled by the lack of a separate document because it took steps—in the form of the December 22, 1997 motion to alter or amend and the January 27, 1998 notice of appeal—to ensure that it was not sleeping on its appellate rights. Therefore, under *Bankers Trust, Smith,* and *Wang,* we find that the parties have waived the separate document requirement of Rule 58. Consequently, we have jurisdiction over the present appeal even though the December 11, 1997 Opinion and Order was not a valid final judgment in compliance with Rule 58.

## II. The District Court's Denial of PRASA's Motion For a Second Partial New Trial on the Issue of Damages

PRASA argues that the district court abused its discretion in denying PRASA's motion for a second partial new trial on the issue of damages. PRASA argues that a second partial new trial should have been granted because: (1) the jury verdict awarding no damages was against the demonstrable weight of the evidence; (2) the district court erred in allowing the jury to redeter-

mine issues already determined by the first jury; and (3) appellees' counsel made improper and prejudicial remarks to the jury during opening and closing statements.

■ The denial of a new trial is reviewed for abuse of discretion. *Bogosian v. Mercedes–Benz of North America, Inc.,* 104 F.3d 472, 482 (1st Cir.1997).

## A. Jury Verdict Against the Weight of the Evidence

■ PRASA first argues that the 1997 jury verdict was against the weight of the evidence because it was inadequate to compensate PRASA for its damages. A verdict may be set aside and a new trial ordered "when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Phav v. Trueblood, Inc.,* 915 F.2d 764, 766 (1st Cir.1990)(citing *Torres–Troche v. Municipality of Yauco,* 873 F.2d 499 (1st Cir.1989)).

PRASA argues that the clear weight of the evidence at the partial new trial established that PRASA suffered significant damages. The jury in the first trial found that Lluch had been negligent in breaching its contract with PRASA, that Lluch's breach caused the collapse of the structure, and that this breach caused damages to PRASA. While the district court set aside the amount of damages awarded as excessive, it did not set aside the jury's finding of negligence or the jury's finding that this negligence caused PRASA damages. Rather, the district court specifically instructed the second jury to accept those two determinations. Then, the district court set the parameters for the amount PRASA could recover by instructing the second jury that:

> PRASA is entitled to recover an amount which will reasonably compensate it for any damages it had suffered as a result of Lluch's breach of contract or negligence as of the date of the collapse on October 22, 1989. Specifically, PRASA is entitled to recover the cost to repair the collapse.

PRASA argues that the clear weight of the evidence presented at the partial trial showed that it suffered significant damages as of the date of the collapse. PRASA breaks down the cost of repair into two components: (1) the cost of preparing the soil to support the repaired roof structure; and (2) the cost of repairing the roof structure itself. The first component was sought by PRASA as the cost of the stabilization of the soil or the installation of piling support at the construction site. PRASA notes that the first jury determined: (1) that Lluch improperly removed the surcharge from the soil at the construction site or in other ways acted negligently in breaching its contract with PRASA; and (2) that Lluch's improper removal caused the collapse of the roof structure. PRASA argues that the cost of repair must include the cost of stabilization or piling support because it would be futile to attempt to install the roof structure again without first improving or supporting the soil.

In an attempt to prove that the soil at the site must be improved or supported before repair of the structure could begin, PRASA offered the testimony of Engineers Carlos Ortiz, Angel Herrera, and Alan Crumley. Ortiz testified that he conducted soil exploration at the site after the collapse and that he determined that the soil had settled nearly 70 cm, almost twice the settlement expected when the site was originally analyzed in 1986. Ortiz also detected settlement of the concrete columns on which the new roof structure would be installed. Ortiz concluded that because the consolidation and settlement of the soil was ongoing at the time of the collapse, the soil needed to be treated in order to build on it. Herrera, an expert in design, construction and estimates of costs of repairs of failures or collapses of structures, testified that, at the time of the collapse, the soil at the site was not competent to support the building as designed. Crumley testified that he analyzed the soil in 1995 and found that primary settlements were still occurring and were therefore occurring at the time of the collapse at a rapid rate. Crumley opined that repairing the collapse in 1989 would have required either improving the soil or installing piles.

The district court apparently agreed with PRASA's assertion that the soil had to be improved before the structure could be re-

paired. Appellees objected to testimony regarding soil improvement measures as beyond the scope of the cost of repairing the collapse, but the court overruled those objections and stated that "to repair he's got to do that."

PRASA attempted to quantify how much it would cost to improve the soil or install piles through Herrera's testimony. Herrera first considered the option of surcharging the soil, but rejected that alternative because of the uncertainty of the settlement. Therefore, Herrera recommended the second alternative: installing piles for support. Herrera testified that properly installing piles for support would require the following steps (and costs): (1) removing portions of the floor slab ($82,500); (2) installing piles ($3,201,000); (3) raising the existing footings ($440,000); (4) installing new footings to connect the piles with the existing footings ($423,835); (5) building concrete foundation beams ($510,-044); and (6) building a new floor slab ($1,220,740). Herrera testified that these steps would cost $5,878,119, plus a six percent consulting fee, for a total cost of improving the soil of $6,230,806.

The second component of the cost of repair sought by PRASA was the repair of the roof structure itself. PRASA argues that the evidence of the cost of reinstalling the collapsed roof varied from $470,000 to $2,513,211.48. PRASA first points to the testimony of Lluch's expert, Engineer Rafael Jiménez. Jiménez testified that repairing the roof structure would require repairing and installing the steel trusses ($420,000), repairing the concrete columns ($21,000), and removing the twisted steel ($70,000), for a total of $511,000. Engineer Edison Lluch also testified for defendants regarding the cost to repair the collapse. Eng. Lluch agreed with Jiménez that those three steps needed to be undertaken, but disagreed with Jiménez's estimate of cost. Eng. Lluch estimated the steps to cost $421,000, $20,000, and $29,000, respectively, for a total of $470,000.

For the highest estimated cost of repair, PRASA points to the cross-examination of Eng. Lluch, during which PRASA claims that Eng. Lluch acknowledged that he had written a letter to Seaboard Surety Company claiming $2,513,211.48 for repair of the structure. In that letter, PRASA claims that Eng. Lluch included estimates on how much it would cost: (1) to remove the collapsed structure; (2) to replace the damaged steel structure; (3) to install the steel structure; and (4) to repair the damage to the concrete columns. However, Eng. Lluch also testified that much of the claimed amount was not related to the collapse, but was related to the fact that Richmond abandoned the project. PRASA does not itemize the $2,513,211.48 claim to explain how much was claimed by Lluch as repair for the collapse and how much was claimed because Richmond abandoned the project.

In total, PRASA claims that the jury was presented evidence that the soil would cost $6,230,806 to improve and that the steel roof structure would cost anywhere from $470,000 to $2,513,211.48 to repair. PRASA argues that the jury verdict awarding no damages was clearly contrary to the weight of this evidence.

In response, appellees offer two arguments. First, appellees raise the legal argument that PRASA was not legally entitled to compensation for the collapse. Appellees argue that Clauses V and VIII of the construction contract provided PRASA with a choice of remedies in the event of a breach by Lluch. Clause V provided that if Lluch failed in the performance of the contract, PRASA could hire a substitute contractor to complete the work at Lluch's expense. Appellees describe this remedy as the "in natura" remedy for breach of contract. Clause VIII was a penalty clause that obligated Lluch to pay PRASA $1,400 for each day that completion of the project was delayed due to Lluch's failure to fulfill its obligations.

Appellees argue that Clauses V and VIII, in conjunction, provide the only remedies available to PRASA: specific performance or substitute performance, with Lluch paying the liquidated late fees or cost overruns. Appellees cite Article 1106 of the Puerto Rico Civil Code for the proposition that, in obligations that include a penalty clause, the penalty shall substitute indemnity for damages. *See* P.R. Laws Ann. tit. 31, § 3131. Appellees also cite *Rodríguez Cancel v.*

*A.E.E.*, 16 P.R. Offic. Trans. 542 (1995), in support of their argument that, by contracting for the "in natura" remedy, the parties precluded the recovery of monetary damages. Appellees argue that, instead of choosing one of those remedies, PRASA unjustifiably demolished the entire structure, making it impossible for either Lluch or a substitute contractor to finish the project. From this, appellees claim that PRASA opted out of both remedies available to it, and therefore is not entitled to recover monetary damages now.

■ We reject appellees' first argument because it ignores the fact that PRASA did not bring its claim solely under a breach of contract theory. Appellees may well be correct that PRASA's remedies for a pure breach of contract action are limited to the remedies provided in the contract. However, while the exact nature of PRASA's claims is not at all clear from the record, this was not a pure breach of contract action. The district court treated the action as a breach of contract action in which the claimed breach of contract was Lluch's negligent construction. The district court asked the first jury: "Do you find that Constructora Lluch improperly removed the surcharge from the construction site or in any other way breached its contract with PRASA by negligent construction work?" Similarly, the district court instructed the second jury to accept as an established fact that Lluch "breached its contract with PRASA by negligent construction work." In numerous instances, the court used hybrid language that makes it clear that it entertained both contract and tort theories and remedies in this case, and properly so. At oral argument, appellees agreed with PRASA that, under *Ramos v. Orientalist Rattan Furniture, Inc.*, 1992 WL 755597 (Puerto Rico 1992), if a party is damaged by acts or omissions that constitute both a breach of contract and a breach of duty, the damaged party may make a tort claim based on the breach of contract. Appellees argue that this was not the case here, but we disagree. Lluch's negligence breached both the construction contract and its duty not to cause damage to others, so PRASA may seek to recover under either a tort or contract theory.

PRASA attempted to recover damages under a negligence tort theory. Article 1054 of the Puerto Rico Civil Code states:

> Those who in fulfilling their obligations are guilty of fraud, negligence, or delay and those who in any manner whatsoever act in contravention of the stipulations of the same shall be subject to indemnity for the losses and damages caused thereby.

P.R. Laws Ann. tit. 31, § 3018.

■■ Nowhere in the construction contract do the parties agree to limit Lluch's liability for any damages suffered by PRASA due to Lluch's negligence. Consequently, appellees may not assert the contractual limits on breach of contract damages as a bar to PRASA's recovery in this case. In short, the collapse of the roof structure was found to be caused by Lluch's negligent construction and was clearly a reasonably foreseeable consequence of such negligence. Therefore, the cost of repairing the structure following the collapse was properly recoverable by PRASA under a tort theory. *See id.* (providing for recovery of "losses and damages" against those who are negligent in fulfilling their obligations); P.R. Laws Ann. tit. 33, § 3024 (defining "losses and damages" as those foreseen or which may have been foreseen at the time of entering into the obligation).

Appellees' second argument is that PRASA could prove no damages in the amount of the cost to repair the structure because PRASA would never have incurred any such damages; Lluch would have. The district court instructed the jury that PRASA was entitled to recover any amount which will reasonably compensate it for any damages it suffered as a result of Lluch's breach of contract or negligence as of the date of the collapse on October 22, 1989; specifically, the cost to repair the collapse. Appellees argue that PRASA would never have actually incurred the cost of repairing the collapse, because that amount would have been absorbed by Lluch. Appellees argue that because Lluch had contracted to deliver the completed structure, Article 1481 of the Civil Code allocated to Lluch any loss caused by destruction of the project before delivery. *See* P.R. Laws Ann. tit. 33, § 4122 ("If the

person who contracted for the work bound himself to furnish the materials, he shall suffer the loss in case of the destruction of the work before it is delivered, unless there has been a delay in receiving it."). From this, appellees argue that, up until PRASA's unjustified demolition of the entire structure, Lluch was responsible for absorbing the cost of repairing the collapsed structure, not PRASA. Appellees argue that this responsibility disappeared when PRASA demolished the entire structure because Lluch could no longer deliver the completed structure.

■ We cannot accept this argument as an explanation for how the jury could reasonably have determined, consistently with its duty to follow the court's instructions, that PRASA was entitled to no damages. Appellees' argument regarding the allocation of the burden of the collapse is a strictly legal theory that was never presented to the jury. At oral argument, counsel for appellees was asked whether this theory was ever presented to the jury. Counsel stated that the theory had been explained in the form of Eng. Lluch's and Jiménez's testimony that the cost of repair was to be absorbed by Lluch and was never to have been invoiced to PRASA. However, the fact that the jury heard testimony regarding Lluch's alleged intent that would give life to appellees' legal theory does not mean that the jury was instructed on the legal theory itself. The jury was specifically instructed that PRASA was entitled to recover the cost of repairing the collapse. The jury was not asked to first determine whether PRASA would have actually suffered the cost of repair if it had not demolished the structure. Appellees do not argue that they objected to this instruction and do not cross-appeal on this issue. In fact, Appellees do not even appear to argue that this portion of the instruction was incorrect. Rather, what appellees seem to argue is that the jury properly awarded no damages despite the existence of this instruction. At oral argument, appellees' counsel was asked whether it was erroneous to instruct the jury that PRASA was entitled to recover

the cost of repairing the collapse. Counsel responded that it was not erroneous to do so, but that PRASA failed to prove the amount. As a result of appellees' failure to object, we accept this instruction as correct and as the law of the case.

■ We are left with a situation in which the court instructed the jury that PRASA could recover the cost of repairing the collapse, and PRASA showed that the cost of repairing the collapse was significant. We do not rule on whether the soil needed to be improved before the structure could be repaired or whether the cost of repairing the roof structure itself was closer to $470,000 or to $2,513,211.48. We find only that, under any of those theories, the evidence before the jury was that the cost of repair was at least $470,000. Consequently, a verdict of no damages is not consonant with both the instructions given and the evidence presented. We find that the jury abdicated its duty to follow the instructions given by the district court, which resulted in a verdict that is against the clear weight of the evidence. Additionally, we find that it was an abuse of the district court's discretion to deny PRASA's motion for a second partial new trial on the issue of damages. The judgment awarding PRASA no damages is vacated, and we remand for a new trial on the issue of damages.

B. **Redetermination of Settled Issues By the Second Jury in Violation of the Seventh Amendment**[3]

PRASA also argues that the district court abused its discretion in allowing the second jury, due to misleading jury instructions and verdict forms, to redetermine the issues of Lluch's liability and the existence of PRASA's damages. PRASA claims that these two issues were revisited by the second jury in violation of the Seventh Amendment, which states that "no fact tried by jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

---

3. Because PRASA alleges other errors that would likely reoccur during the partial new trial on remand, we address PRASA's remaining contentions even though we have already vacated the judgment and remanded for a new trial.

■ We summarily dismiss PRASA's claim that the jury was allowed to redetermine the issue of Lluch's liability. PRASA offers nothing more than the absence of a jury award in support of its argument. However, the jury was specifically instructed: (1) that it had already been established that Lluch was negligent and breached its contract with PRASA; (2) that Lluch's breach caused the collapse of the structure; and (3) that PRASA was entitled to recover any damages it suffered due to Lluch's negligence or breach. In light of these instructions, it simply cannot be said that the 1997 jury was allowed to redetermine the question of Lluch's liability. In fact, the jury was specifically told that this issue had been determined and that they should disregard any testimony to the contrary. Thus, we turn to PRASA's contention that the jury was improperly allowed to redetermine the existence of PRASA's damages.

■ PRASA argues that the district court violated the Seventh Amendment when it did not set aside the first jury's determination that Lluch's negligence caused PRASA damages, but still allowed the second jury to redetermine the existence of PRASA's damages. PRASA argues that the second jury should only have determined the *extent* of PRASA's damages, not whether PRASA suffered any damages at all. PRASA argues that the second jury was allowed to revisit this issue because the district court: (1) failed to instruct the jury that it was already established that PRASA suffered damages; and (2) specifically instructed the jury that it had the option of finding that PRASA had not suffered any damages.

PRASA cites several cases for the proposition that the Seventh Amendment requires district courts to conduct successive trials in such a way that the same issue is not reexamined by different juries. Without addressing the questions of whether the authority cited by PRASA adequately demonstrates such a Seventh Amendment principle or whether that principle is applicable in the context of a partial new trial on the issue of damages, we note that no such principle was violated in this case. The district court did not allow the second jury to redetermine the issue of whether PRASA suffered damages. It is true that the second jury was not instructed that it had already been established that PRASA suffered damages. And it is also true that the second jury was instructed that it could fail to award PRASA any damages at all. However, this instruction was given in the context of explaining to the jury that it was PRASA's duty to establish the amount of any damages caused by Lluch's negligence or breach of contract. *See id.* It is neither inaccurate nor an infringement on PRASA's Seventh Amendment rights to instruct the jury that PRASA could not recover any damages if it failed to prove any damages at the partial new trial, whether the previous jury found that PRASA suffered any damages or not. To hold otherwise would be to hold that the jury was obligated to award PRASA damages even if PRASA failed to put on any evidence at all at the partial new trial. This cannot be the case. Thus, the district court did not err in instructing the jury that it could fail to award PRASA any damages at all, despite the first jury's determination that PRASA was damaged by Lluch's negligence.

In short, the district court did not err in failing to order a second partial new trial because of the alleged reexamination of issues by the second jury. No such reexamination of issues actually occurred.

## C. Unfair Influence on the Verdict Through Appellees' Counsel's Prejudicial Comments During Opening Statements and Closing Arguments

PRASA's final contention as to why the district court should have granted a second partial new trial on the issue of damages is that appellees' counsel unfairly influenced the verdict with two impermissible and prejudicial arguments to the jury. PRASA claims: (1) that CNA's counsel made improper reference to the limits of Lluch's insurance policy with CNA during CNA's opening statement; and (2) that Lluch's counsel made improper reference to PRASA's demolition of the structure during Lluch's closing argument.

■ Absent an abuse of discretion, we will defer to the district court's denial of a

motion for a new trial on the basis of improper argument or conduct of counsel. *See Meyers v. Moody*, 693 F.2d 1196, 1220–21 (5th Cir.1982), *cert. denied*, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983); *see also Johnson v. National Sea Prods., Ltd.*, 35 F.3d 626, 631 (1st Cir.1994). In assessing the effect of improper conduct by counsel, the Court must examine the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself. *See Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir.1988)(quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980)). We reverse only upon a showing of prejudice. *See González–Marin v. Equitable Life Assurance Soc'y*, 845 F.2d 1140, 1147 (1st Cir.1988).

▇▇▇ PRASA first complains of CNA's counsel's reference to Lluch's policy limits in CNA's opening statement. PRASA claims that this was done for the sole reason of appealing to jury sympathy. CNA pointed out that Lluch would have to pay most of the millions sought by PRASA from its own funds, because the insurance policy limit was $500,000. However, the parties agree that the insurance policy was admitted into evidence as Joint Exhibit VII. Because the jury could have easily discovered the policy limits for itself, we cannot say that the district court abused its discretion in refusing to grant a new trial on the basis of CNA's improper argument.

▇▇▇ PRASA next complains that it was improper for Lluch's counsel to make reference to PRASA's demolition of the structure in his closing argument. However, because PRASA did not make a timely objection to this statement, we review only for plain error. *See Fernández v. Corporación Insular De Seguros*, 79 F.3d 207, 210 (1st Cir.1996); *Johnson*, 35 F.3d at 631 (citations omitted).

We do not find it to be plain error: (1) to allow Lluch's counsel to refer to the demolition of the structure; or (2) to fail to grant a new trial on the basis of such a reference. It was a stipulated fact that the demolition of

the structure occurred in the weeks following January 25, 1993. Also, the jury was specifically instructed that it had already been established that PRASA's demolition of the structure was unjustified. In light of the evidence and instructions with which the jury was provided, we do not believe that Lluch's mention of the demolition during closing argument resulted in any prejudice to PRASA.

In sum, the district court did not err in failing to grant a second partial new trial due to the reference to Lluch's policy limits during CNA's opening statement or the reference to PRASA's demolition of the structure during Lluch's closing argument.

## III. Jury Verdict in Favor of Lluch's Counterclaims

PRASA's final argument regards a portion of the 1993 verdict that was not remitted: the award of $756,471.59 in favor of Lluch on its counterclaims for breach of contract and amounts owed on the contract. PRASA complains that this award was also against the weight of the evidence.

### A. Preservation of This Issue On Appeal

▇▇▇ A motion for a new trial must be made in the first instance before the trial court, particularly where the weight of the evidence is at issue. *See Velázquez v. Figueroa–Gómez*, 996 F.2d 425, 427 (1st Cir.), *cert. denied*, 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993); *Wells Real Estate v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir.) (citing 6A Moore's Federal Practice § 59.15[3], at 326–27 (2d ed.1987)), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988). The failure to move for a new trial waives the issue on appeal. *See Velázquez*, 996 F.2d at 427; *Wells Real Estate*, 850 F.2d at 811.

PRASA did not move for a new trial on Lluch's counterclaims. However, following the judgment on Lluch's counterclaims, PRASA filed a two-page motion for judgment as a matter of law on those claims. On October 27, 1995, the district denied PRASA's motion. The district court found that Lluch presented evidence: (1) that PRASA

breached the contract; (2) that this breach caused damages to Lluch; and (3) that PRASA owed Lluch monies on the contract. The district court found that the evidence presented was sufficient to allow a reasonable jury to reach a verdict in favor of Lluch on its counterclaims.

While PRASA's failure to file a motion for a new trial would ordinarily require this Court to find that the issue has been waived, the fact that PRASA filed a motion for judgment as a matter of law helps PRASA to avoid that result. In *Velázquez*, the appellants sought to challenge the verdict as against the weight of the evidence. *See Velázquez*, 996 F.2d at 427. We held that, even though the appellants failed to make the appropriate motion for a new trial before the district court, the issue was not waived because the appellants made a motion to set aside or amend the verdict. *See id.* We found that because the purpose of the appellants' motion was to challenge the verdict as against the weight of the evidence, the appellants should not have been deemed to have waived the issue. *See id.* We noted that the district court addressed the sufficiency argument and denied the motion because the jury's verdict was supported by the evidence. *See id.* Consequently, we treated the appellants' motion as a motion for a new trial and treated the appeal as an appeal of the denial of that motion for a new trial. *See id.*

The same situation is presented in the present appeal: (1) PRASA made a motion challenging the verdict as against the weight of the evidence; (2) the district court addressed the sufficiency argument; and (3) the district court denied the motion because the jury's verdict was supported by the evidence. Therefore, we treat this appeal as an appeal from the denial of PRASA's motion for a new trial on Lluch's counterclaims.

**B. Denial of PRASA's Motion for a New Trial on Lluch's Counterclaims**

Again, the denial of a motion for a new trial is reviewed for abuse of discretion. *See Bogosian*, 104 F.3d at 482. A verdict may be set aside and a new trial ordered "when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Phav*, 915 F.2d at 766.

PRASA points to the testimony of José A. Toro–Mercado, a certified public accountant who PRASA claims testified on behalf of Lluch that PRASA owed Lluch $2,121,956.35 as a result of change orders, additional work, materials, and extended office overhead. PRASA claims that Toro–Mercado's testimony was based on three main, but faulty, premises: (1) that Lebrón, the designer of the project, was at fault for the collapse of the steel roof structure; (2) that all delays in the construction project were attributable to PRASA; and (3) that Lluch had worked at the project between August 1, 1988 and October 20, 1990.

PRASA argues that the first of these three premises was contradicted by the 1993 jury verdict itself. PRASA claims that the 1993 jury specifically ruled that Lluch, not Lebrón, was solely liable to PRASA for the negligent removal of the surcharge that caused the collapse of the structure. PRASA argues that the second premise was also contradicted by the 1993 jury verdict and the evidence adduced at trial. PRASA notes that the 1993 jury omitted any finding that PRASA had been solely responsible for the delays in the project. PRASA also claims that all of the evidence regarding job certifications that was presented at trial showed that Lluch or its subcontractors were as much responsible for the delays as was PRASA. PRASA also notes that "the certifications were reconciled during trial by the parties, clearly showing that PRASA was not remotely the sole responsible party for the delays in the project." Regarding the third premise, PRASA argues that there was "better evidence" of the time period of Lluch's presence at the project.

PRASA's argument fails in several respects. First, while the 1993 jury found Lluch to have been liable, it did not find that Lebrón was faultless. The liability of Lebrón was not before the jury, and the jury made no determinations regarding this issue. Second, the "omission" of a finding that PRASA was solely responsible for project delays is hardly a finding that PRASA was not responsible for any delays that may have

caused Lluch damages. Third, PRASA does not direct the Court to any of the evidence it claims demonstrated Lluch's responsibility for delay in construction. Fourth, even if the certifications were "reconciled" during trial, PRASA does not explain to the Court how that "clearly show[s] that PRASA was not remotely the sole responsible party for the delays in the project." Fifth, PRASA makes no attempt to identify the "better evidence" of an allegedly more accurate time period of Lluch's involvement in the project.

Finally, and most importantly, the jury awarded Lluch $756,471.59 on its counterclaims, even though PRASA admits that Toro–Mercado testified that PRASA owed Lluch $2,121,956.35. It is quite possible that the jury questioned Toro–Mercado's three premises and reduced the damages award accordingly. For example, the jury may have reduced the award by the amount it determined that Lluch was at fault for the delays. Or it may have reduced the award because it did not agree that Lebrón was solely at fault for the collapse. Or it may have reduced the award because it believed that the "better evidence" referred to by PRASA demonstrated that Lluch was not on the job as long as it claimed. This is, of course, all speculation, but PRASA does not offer any argument as to why the amount actually awarded was against the weight of the evidence. PRASA offers several arguments that demonstrate why Lluch should not have been granted all it requested, but the fact remains that Lluch was not granted all it requested.

In the jury verdict form, the 1993 jury found: (1) that PRASA breached its contract with Lluch; (2) that this breach caused damages to Lluch in the amount of $138,758; and (3) that PRASA owed Lluch $617,713.59 for work performed on the contract. PRASA does not offer any evidence or argument that Lluch did not in fact suffer damages in the amount of $138,758 or that Lluch was not in fact owed $617,713.59 for work performed on the contract. Consequently, we reject PRASA's claims that the verdict was against the weight of the evidence and leave undisturbed the judgment in favor of Lluch on its counterclaims.

## CONCLUSION

Based on the foregoing, the judgment awarding PRASA no damages is **VACATED**, and this case is **REMANDED** for a new trial on the issue of damages. The judgment awarding Lluch $756,471.59 on its counterclaims for breach of contract and amounts owed on the contract is **AFFIRMED**.