# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 20, 2008

Charles R. Fulbruge III
Clerk

No. 06-30998

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

HENRY A. DILLON, III

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, CLEMENT, and ELROD, Circuit Judges.

GARWOOD, Circuit Judge:

Former Assistant City Attorney of New Orleans, Henry Dillon, appeals his jury trial conviction under 18 U.S.C. § 242 for depriving Sandy Carraby and Carolyn Carter of their right to bodily integrity under color of law. Dillon's contentions on appeal are that there was not sufficient evidence to show that he acted under color of law when he sexually assaulted his victims, and that the district court abused its discretion in admitting evidence of two other alleged sexual assaults by him under Federal Rule of Evidence 413. We hold that the evidence was sufficient to support the finding that the charged assaults were under color of law, and that the district court did not abuse its discretion in

admitting evidence of the two other assaults under Rule 413. We accordingly affirm.

## FACTS AND PROCEEDINGS BELOW

Dillon was an attorney licensed to practice law in the state of Louisiana where he maintained a private practice. Dillon also served as an Assistant City Attorney ("ACA") for the City of New Orleans. In the latter capacity, he was assigned, on a part-time basis, to prosecute minor municipal offenses and traffic violations in the local municipal and traffic courts on behalf of the City of New Orleans. These courts operate informally with most cases resolved summarily at arraignment. Defendants often appear unrepresented and resolve their cases directly with the prosecutors, who exercise substantial discretion.

## I.    Carolyn Carter

Carter met Dillon after being arrested in December of 2003 for a minor traffic offense. One of her friends suggested that she talk to Dillon to see if he could help her with her tickets because he was an ACA. She followed this advice and Dillon arranged for the dismissal of some of her pending tickets. On January 15, 2004, Carter returned to traffic court to address the remaining tickets pursuant to Dillon's promise to fix them. That afternoon Carter learned that her son had been arrested on a municipal battery charge, and she sought Dillon's assistance in securing his release from jail. Dillon told Carter to come, alone, to his private law office later that day to discuss her son's situation.

Carter testified that she arrived at Dillon's office around 9:00 p.m. Dillon then asked her to give him her son's name, date of birth, and social security number. Dillon then called a state court judge to arrange for Carter's son to be "paroled."[1] After placing the call, Dillon told Carter, "I told you I can make it happen." At that point, Carter attempted to leave, but Dillon stopped her, began kissing her, and pushed her into another room. Once in the other room, Dillon

---

[1] In Orleans Parish, state court judges can exercise their "parole power" to secure the release of arrestees on their own recognizance.

told Carter that he knew "a lot of police officers and he [could] have anybody arrested" and that if she wanted her son out of jail she should "[q]uit acting like a baby." Dillon proceeded to rape Carter. Dillon then told Carter to clean herself up, and she left his office. Dillon left her with the impression he could have her son re-arrested at any time. Carter did not report this incident until after she learned Dillon was arrested for attacking Carraby.

## II.    Sandy Carraby

On July 2, 2004, Carraby was arrested on municipal charges of lewd conduct and trespassing. She had previously been charged with possession of marijuana. Carraby appeared at municipal court on the lewd conduct and trespassing charges pursuant to a notice on November 30, 2004. According to local practice, Carraby was sent to discuss her case with Dillon because he was the ACA for the court to which her case was assigned. Carraby testified that when she went into Dillon's office at the courthouse he asked her inappropriate questions about what clothes she was wearing when she was arrested and whether she had sex with her boyfriend. They also discussed Carraby's state marijuana charge.[2] Dillon told her that she would have to take a drug test because of the marijuana charge, so she should come to his "other" office later that day to take the test.

At 1:00 p.m., Carraby came to Dillon's office with her aunt, but when she went upstairs to his office, it was locked. As Carraby came back downstairs, Dillon arrived at the building. Dillon told Carraby to have her aunt wait in the car, and the two of them then proceeded to Dillon's office. Once there, Dillon asked Carraby for her phone number, date of birth, and social security number.

---

[2] The government acknowledges that the marijuana charge had been refused by the district attorney's office weeks before Carraby met Dillon, but Carraby testified that she did not know the status of the marijuana charge when she appeared in municipal court.

He then placed a phone call.[3]  After placing this call, Dillon approached Carraby and began kissing her.  She attempted to resist and Dillon told her that nobody would believe her over him if she reported him because she had "lewd conduct on [her] record."  Then he forcibly held her down, pulled down her pants, and raped her.  Afterwards, Carraby testified that Dillon threatened her to keep quiet or else he would "come after me and my family."

Carraby left Dillon's office and drove home with her aunt.  Once she arrived at her aunt's house, she told her family that she had been sexually assaulted by Dillon.  The authorities were notified and Dillon was arrested the following day.  Carraby also underwent a rape examination that evening.  During that examination, the nurse noted that Carraby was suffering from pain to her back and genital area but that the physical evidence of sexual activity was equally consistent with consensual intercourse as it was with nonconsensual intercourse.

III.  Court Proceedings

On December 2, 2005, Dillon was charged in a two-count indictment with depriving individuals of their civil rights under color of law in violation of 18 U.S.C. § 242.  Count one charged Dillon with depriving Carraby of her bodily integrity by sexually assaulting her.  It also asserted that Dillon's conduct constituted "aggravated sexual abuse" that resulted in "bodily injury."  Count two similarly charged the defendant with depriving Carter of her bodily integrity by sexually assaulting her.  It also asserted that Dillon's conduct constituted "aggravated sexual abuse" that resulted in "bodily injury."

Before trial, the government timely gave notice that it was seeking to introduce evidence of four other alleged sexual assaults committed by Dillon under Federal Rule of Evidence 413.  Dillon objected that this evidence was

---

[3] Carraby testified that she did not know whom Dillon called; Dillon testified that he called the clerk's office to check the status of Carraby's marijuana charge.

substantially more prejudicial than it was probative, and therefore, should not be admitted according to Federal Rule of Evidence 403. On April 7, 2006, the district court issued its written Order and Reasons holding that it would admit testimony relating to two of the four prior alleged sexual assaults.

The case proceeded to trial and verdict. Dillon testified, admitted sexual intercourse with Carraby and Carter on the occasions alleged, but asserted that it was entirely consensual. The jury found Dillon guilty on count one (Carraby), and found that Dillon's acts resulted in "bodily injury" and included "aggravated sexual abuse." The jury found Dillon guilty on count two (Carter), and found that Dillon's acts included "aggravated sexual abuse" but did not result in "bodily injury." Dillon moved for judgments of acquittal at the close of the prosecution's case and again at the close of all the evidence. These motions were denied. The district court sentenced Dillon to life imprisonment on each count, to be served concurrently. Dillon filed a timely appeal.

## DISCUSSION

### I. Color of Law

Dillon argues on appeal that the government did not present sufficient evidence to carry its burden of showing that the sexual assaults attributed to him respecting Carter and Carraby occurred under color of law. He does not otherwise contest the sufficiency of the evidence on either count.

#### A. Standard of Review

"The standard for evaluating the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." United States v. Williams, 132 F.3d 1055, 1059 (5th Cir. 1998). This court reviews all the evidence, and the reasonable inferences that may be drawn from it, in the light most favorable to the verdict. United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992). We may not substitute our own

credibility judgment for that of the jury, which is solely responsible for determining the weight and credibility of the evidence. United States v. Martinez, 975 F.2d 159, 161 (5th Cir. 1992).

B.     Did Dillon Act Under the Color of Law?

To support the civil rights convictions in this case the government had the burden of proving that Dillon acted "under color of any law." 18 U.S.C. § 242. An action occurs under color of law when there is "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." United States v. Classic, 61 S.Ct. 1031, 1043 (1941). The Supreme Court later simplified this formula and stated that "under 'color' of law means under 'pretense' of law." Screws v. United States, 65 S.Ct. 1031, 1040 (1945).

This court has had the opportunity to interpret the color of law requirement a number of times. In United States v. Tarpley, this court held that defendant, a sheriff, acted under color of law when he had his wife lure the man with whom she was having an affair to their house so that he could assault him. 945 F.2d 806, 807-08 (5th Cir. 1991). Central to the outcome of the case was that Tarpley claimed to have special authority because he was an officer of the law, used his service weapon, was aided by a fellow officer, and ran the victim out of town in his squad car. Id. at 809. Because of these actions this court held that an "air of official authority pervaded the entire incident." Id.[4]

In Bennett v. Pippin, this court held that defendant, a sheriff, acted under color of law when he raped a woman whom he had just finished questioning about a shooting he was investigating. 74 F.3d 578, 589 (5th Cir. 1996). The sheriff responded to the victim's refusal of his advances by saying, "'I can do

---

[4] Tarpley explains that "individuals pursuing private aims and not acting by virtue of state authority are not acting under color of law purely because they are state officers." Id. at 809.

what I want, I'm the Sheriff.'" Id. Additionally, the sheriff admitted that he used his authority to discover that the victim's husband would not be home and had entered her property by virtue of his authority as sheriff, and it was established that the victim needed the sheriff's permission to retrieve her pickup truck. Id. These actions were held to have a "'real nexus'" with the sheriff's authority. Id.

In United States v. Causey, this court held that defendant, police officer Davis, was acting under color of law when he conspired to murder an individual who had filed an internal affairs complaint against him. 185 F.3d 407, 415-16 (5th Cir. 1999). In order to carry out the murder, officer Davis held a meeting with his co-conspirators at the police station, used his police car to show the co-conspirators where to find the victim, communicated with the co-conspirators via his police radio, secured the cooperation of his accomplices by assurance of police protection, and planned to use his official authority to cover up the murder at the crime scene. Id. at 415. The court held that Davis was uniquely able to do these things because of his position as a police officer, so there was a sufficient nexus between his use and abuse of the power conferred on him by law and the murder to satisfy the color of law requirement. Id. at 415-16.

Finally in Townsend v. Moya, this court held that defendant, Hill, a prison guard, did not act under the color of law when he stabbed Townsend, an inmate, after the two men entered into a game of "'come on'" in which they took turns referring to each other as "'my bitch'" or "'whore'." 291 F.3d 859, 860 (5th Cir. 2002). In reaching this decision, this court held that the two men were engaging in horseplay, a purely private action, so Hill was not acting under color of law when he stabbed Townsend, even though he used "a knife he possessed by virtue of his position and authority." Id. at 862. See also, e.g., Delcambre v. Delcambre, 635 F.2d 407 (5th Cir. 1981) (chief of police on duty at police station assaults

sister-in-law there in purely private family dispute, victim not arrested or threatened with arrest; not under color of law).

In these cases, the determining factor of whether a government official was acting under color of law generally was "whether there [was] a nexus between the victim, the improper conduct and [the defendant's] performance of official duties." Causey, 185 F.3d at 415.

While Dillon did not use equipment obtained through his official position to commit the sexual assaults, like the police officer in Causey, his attacks were not disconnected from his position of authority, as the prison guard's were in Townsend. During trial the government presented evidence that both Carter and Carraby initially met Dillon through his position as an ACA. They came to his office because they believed that his position as a ACA enabled him to help them with their legal problems: Carter sought his fixing her tickets and help in having her son released from jail and Carraby thought he was going to give her a drug test so she could have her pending marijuana charge dismissed. These actions are similar to the sheriff's use of his position to gain access to his victim's house under the pretense of having to interview her about a shooting he was investigating. See Bennett, 74 F.3d at 589. The defense argues that Dillon was not acting under color of law because Carter and Carraby were seeking Dillon's help with matters that were not directly related to his position as an ACA. However, Dillon did have authority as to Carter's tickets, and his position enabled him to procure her son's release from jail. And, Dillon misled Carraby into believing her marijuana charge was pending and that he could have it dismissed. The testimony of Carter and Carraby indicates that they thought that Dillon's position as an ACA put him in a position to help them.

Nevertheless, the fact that Dillon took advantage of his position to initially become acquainted with his victims does not alone suffice to find that his subsequent assaults were under color of law. There needs to have been a more

8

meaningful nexus between the defendant's use or abuse of his position of actual or ostensible authority and the actual commission of the offense.

Dillon created this nexus when he verbally invoked his power before, during and after he sexually assaulted Carter and Carraby. As to Carter, after he placed a call to the judge who ultimately paroled Carter's son, Dillon boasted that he told her he could "make it happen." He then proceeded to kiss her and when she resisted he told her that he knew "a lot of police officers and he [could] have anybody arrested" and that Carter should "[q]uit acting like a baby" if she wanted her son out of jail. Dillon, by his statements, also left Carter the impression that he could have her son re-arrested at any time, in his effort to keep her from reporting him. As to Carraby, Dillon told her that to get her marijuana charge dismissed, which he in effect had led her to believe he could and would do as an ACA, she would have to come to his "other" office for a (completely bogus) marijuana test. Then, before sexually assaulting her there, Dillon told her that nobody would believe her if she reported him because she had a lewd conduct charge on her record. Carraby also testified that Dillon warned her not to tell anyone about the assault or he would "come after [her] and [her] family."

These remarks are similar to those made in Bennett and Tarpley. The sheriff told his victim, while beating him and holding a gun in his mouth, that he could kill him because he was a police officer. Tarpley, 945 F.2d at 808. The sheriff told his victim before he raped her that he was the sheriff so he could do what he pleased. Bennett, 74 F.3d at 589. The predominant distinguishing factor between these statements and Dillon's are that Dillon never explicitly mentioned his position as an ACA. To hold that this distinction was sufficient to remove Dillon's conduct from being under color of law, however, would be to elevate form over substance. The substance of his statements clearly invoked his actual or perceived power as a city prosecutor, as it was only in that capacity

that he and the victims were then relating to each other. The statements carried with them an air of official authority that this court held to be decisive in Tarpley, and a reasonable jury could have found, considering the totality of the circumstances, that these statements were invocations of his authority intended to compel Carter and Carraby to comply with his sexual demands and not to report the rapes.

## II.    Rule 413 Evidence

Dillon argues that the testimony of Timika Jones and Sheena Cheneau regarding uncharged sexual assaults was improperly admitted because its probative value did not substantially outweigh its prejudicial effect.

Generally, evidence of prior bad acts is not admissible to show propensity. FED. R. EVID. 404(b). Rule 413(a), however, allows the admission of evidence of prior sexual assaults for any relevant purpose, including to show propensity, in sexual assault cases. United States v. Guidry, 456 F.3d 493, 503 (5th Cir. 2006).

To be admissible under Rule 413, the uncharged "offense of sexual assault" need not be established by a conviction, Guidry at 502-03, but the district court must make a preliminary finding that a jury could reasonably find by a preponderance of the evidence that the defendant committed the other act and that it constituted an "offense of sexual assault" for purposes of Rule 413. Guidry at 501, 503 n.5; United States v. Enjady, 134 F.3d 1427, 1433 (10th Cir. 1998); Johnson v. Elk Lake School District, 283 F.3d 138, 152-55 (3d Cir. 2002). Rule 413(d) provides that for its purposes "'offense of sexual assault' means a crime under Federal law or the law of a State . . . that involved" any one of five different listed criteria, the first of which is "(1) any conduct proscribed by chapter 109A ["Sexual Abuse," §§ 2241-2248] of title 18" and the third of which is "(3) contact, without consent, between the genitals or anus of the defendant and any part of another person's body."

Evidence admissible under Rule 413 is still subject to the Rule 403 balancing test, so it may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403; Guidry, 456 F.3d at 503.

We review the district court's evidentiary rulings under an abuse of discretion standard; we review de novo a court's interpretation of law. Guidry at 501 (Rule 413); United States v. Hitt, 473 F.3d 146, 159 (5th Cir. 2006), cert. denied, 127 S.Ct. 2083 (2007) (Rule 413). A district court's determination under Rule 403 with respect to whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice is reviewed under an abuse of discretion standard but, at least generally, with "an especially high level of deference to" the district court, with reversal called for only "'rarely' and only when there has been 'a clear abuse of discretion.'" United States v. Fields, 483 F.3d 313, 354 (5th Cir. 2007) ( quoting United States v. Maggitt, 784 F.2d 590, 597 (5th Cir. 1986)), cert. denied, 128 S.Ct. 1065 (2008).

In this case, the government sought to admit testimony about four uncharged sexual assaults allegedly committed by Dillon against four different women, and gave timely notice under Rule 413(b). Dillon objected to the admission of any testimony related to the uncharged incidents on the grounds that its probative value was substantially outweighed by its danger of unfair prejudice. The district court held a hearing and determined that it would admit the testimony of Jones and Cheneau, which it concluded was such as to allow a jury to reasonably find by a preponderance of the evidence that Dillon committed an offense of sexual assault on each of them, and that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice under Rule 403. However, the court excluded the testimony of the two other women under the Rule 403 balancing test. The district court reached this conclusion because the sexual assaults were not as related to Dillon's official

duties as were Jones's and Cheneau's and they occurred more than seven years before the sexual assaults for which he was charged. The court admitted the testimony of Jones and Cheneau because their allegations were similar to the conduct charged in the indictment and occurred in roughly the same time frame, so they had probative value particularly as to whether the women consented.

A.    Timika Jones

Jones testified that she first met Dillon as an ACA at traffic court where he offered to "get rid of" her outstanding parking tickets "for $150 or sex." She declined that invitation, and Dillon reset her court date. Thereafter, late one evening in November 2004, Jones ran into Dillon at a liquor store near her grandmother's house in New Orleans. Jones had been dropped off at the store by some friends and planned to take the bus home. Dillon offered Jones a ride so that she would not have to wait for the bus. On the ride home, Dillon passed the turnoff to Jones's house and continued on to a desolate, unlighted area on Almonaster Road. At that point, he began rubbing Jones's leg. He then instructed her to manually masturbate him. Jones complied because she was scared. He then told Jones to perform oral sex on him, and he stated that if she did not do so he would "put [her] out of his car." Jones thereafter complied because she was afraid that anything could happen to her if he put her out of the car. Dillon then drove Jones home. After that night, Dillon continued to call Jones seeking payment or sex for helping her with her traffic tickets. Dillon testified he did not even know Jones.

Dillon argues that the district court erred by admitting Jones's testimony under Rule 413 because he did not use force, a threat of force, or fear to secure her involvement in the intercourse and because his encounters with Jones were not sufficiently similar to the charged offenses to be probative. Dillon's initial argument has no merit. Force, or a threat of force, is not required, only a lack

of victim consent.[5] Jones testified that she complied with Dillon's demand for sexual gratification because he threatened to put her out of the car if she did not comply and she feared he would do so. The jury could reasonably find that Jones's acts were not consensual and that Dillon intentionally put her in fear.[6]

Next, Dillon argues that the probative value of Jones's testimony was substantially outweighed by its potential to unfairly prejudice the jury because it was not sufficiently similar to the charged sexual assaults, so it should have been excluded under Rule 403. To evaluate this argument, we first look to the text of Rule 413, which instructs that evidence of prior sexual assaults "may be considered for its bearing on any matter to which it is relevant." FED. R. EVID. 413(a). This broad allowance for admission is limited by Rule 403's balancing test, which allows evidence to be admitted as long as its probative value is not substantially outweighed by its potential for unfair prejudice. See Guidry, 456 F.3d at 503. Similarity is relevant because the more similar the uncharged activity is to the charged offense, the more probative it is. Id. at 504 n.6. Consequently, Jones's alleged sexual assault does not need to have been identical to Carraby's and Carter's to be admissible, but aspects of the assault

---

[5] See LA. REV. STAT. ANN. § 14:43.1(A)(2) (where offender "intentionally" engages in an act "without the consent of the victim" in which the offender's genitals are touched by any part of the body of the victim). See also 18 U.S.C. § 2242(1) ("sexual abuse" by knowingly causing another "to engage in a sexual act by threatening or placing that other person in fear"); 18 U.S.C. § 2246(2)(B) (defining sexual act).

[6] The 20-year-old, petite Jones testified that the road they were on – between midnight and 1 a.m. in November – was "just nothing but trees . . . no street lights" and was "something like" a "swamp;" she "was scared . . . [b]ecause I didn't know what he could do me on that street . . . it really wasn't nothing out there." She testified that she did what he told her to do "[b]ecause I was, like, he could either kill me, hurt me or something on that street. Nobody would ever know what would have happened because there is, ain't nothing out there." When Dillon told her to perform oral sex on him, she looked at him and then "he told me if I don't do what he says, he was going to put me out of his car" there on the deserted road they were traveling. She testified she was "scared" "[b]ecause . . . if he put me out of his car, anything else could have happened to me on that street. Somebody could either pick me up or beat me up or something." She did not feel that she "had any choice" and went on and complied with his command to perform oral sex.

must have sufficient probative value as to some element of the charged offense to not be substantially outweighed by its danger of unfair prejudice.

In order to prove its case against Dillon, the government bore the burden of establishing a number of elements, including that: Dillon had sex with Carraby and Carter, the sex was not consensual, and Dillon acted under color of law. Dillon's position, as reflected in his counsel's opening statement at the beginning of trial and in his testimony, was that his sexual intercourse with Carraby and with Carter was consensual. Jones's testimony that Dillon had told her that he would fix her tickets for $150 or sex is probative because it indicates that Dillon was willing to use his official position to coerce women into having sexual relations with him. The fact that Dillon coerced Jones into performing sex acts on him is probative of whether he would have had nonconsensual intercourse with Carraby and Carter. Finally, Jones's alleged sexual assault took place less than a month before Dillon sexually assaulted Carraby. The close proximity in time of Dillon's assault of Jones with one of the charged offenses heightens the probative value of Jones's testimony. See id. Under the appropriate standard of review, we are unable to conclude that the district court abused its discretion in admitting Jones's testimony.

B.    Sheena Cheneau

Cheneau met Dillon at municipal court. She was the victim in a battery case Dillon was prosecuting. Dillon told Cheneau that she looked "sexy" and "fine." On September 9, 2004, Cheneau asked Dillon if he could fix some traffic tickets for her, and she gave him her phone number. They later set up an appointment to resolve her outstanding tickets at Dillon's private office. At that meeting, Dillon began rubbing her shoulders. The gesture was unwanted and made Cheneau feel uncomfortable, but no other contact occurred during that meeting. In mid-November 2004, Cheneau returned to Dillon's office because she needed money to repair her mother's car, which Cheneau had been driving

when another vehicle caused an accident. Dillon gave her $300 to fix her car. He then told her to come into the next room where he began massaging her breasts. She asked him to stop, but he pushed her down onto the couch, pinned her arms back, and sexually assaulted her in a physically similar manner to how he attacked Carter and would later attack Carraby. During the rape, Dillon told Cheneau: "I'm a powerful person. I know people in all places and I will destroy you and your family. And nobody will ever work in this city again." After the sexual assault, Dillon made Cheneau clean up the couch and then she left his office. Dillon testified his sex with Cheneau was consensual.

Dillon admits that Cheneau's alleged sexual assault meets Rule 413's definition of an offense of sexual assault and that it was similar to the charged offenses except that there is no indication that the conduct occurred under color of law. As discussed above, evidence of a sexual assault admitted under Rule 413 need not be similar in every respect to the charged offense; it only needs to be probative as to some element of the charged offense. Here, the alleged sexual assault occurred in the same location and in a similar manner to the charged offenses. It also happened within a few weeks of Carraby's sexual assault. These similarities make Cheneau's testimony probative of whether Carter and Carraby consented to sex with Dillon and corroborates their testimony regarding how their sexual assaults occurred. Furthermore, a reasonable jury could have found that Dillon's statements that he was "a powerful person," who knew "people in all places," and who could "destroy [Cheneau] and [her] family" were invocations of his official position and thus probative of his willingness to invoke his purported authority for his private ends. And, these statements were also somewhat like the similar statements to Carter and Carraby intended to prevent them from reporting him.

Dillon also argues that Cheneau's testimony is inadmissible because it was not sufficiently credible to have been submitted to the jury under Rule 104(b).[7] To support this argument, he cites a Tenth Circuit case in which the defendant asserted that a different victim's testimony about an uncharged sexual assault should not have been admitted because her testimony failed to establish, by a preponderance of the evidence, that she was sexually assaulted. United States v. Enjady, 134 F.3d 1427, 1434 (10th Cir. 1998). Specifically, Dillon cites a passage from the opinion in which the court noted that the victim's contemporaneous police report helped support the victim's testimony. Id. From this, he extrapolates that corroboration is necessary when assessing whether allegations of uncharged sexual misconduct are admissible. This passage, however, is inapplicable to this case. In Enjady, the Tenth Circuit held that before evidence of uncharged sexual assaults is admitted under Rule 413, the district court must make a preliminary finding that a jury could reasonably find by a preponderance of the evidence that the 'other act' occurred. Enjady, 134 F.3d at 1433. The district court there, however, refused to conduct a hearing to determine whether evidence from the victim of an uncharged assault could support a finding by a preponderance of the evidence that the defendant sexually assaulted her. Id. at 1434. On appeal, the Tenth Circuit ultimately sustained admission of the evidence, despite the lack of a hearing, because it was corroborated by the police report. Id. The district court in the present case, however, did hold a pretrial hearing, at which it considered Jones's and Cheneau's allegations and determined that they were relevant, probative, and admissible and "that a reasonable jury could find by a preponderance of the

---

[7] Rule 104(b) deals with the admission of evidence that is relevant upon the fulfillment of a condition of fact. It permits conditionally relevant evidence to be admitted "upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." FED. R. EVID. 104(b).

evidence that these acts were sexual assaults committed by the defendant." Thus, no corroboration would have been required under the Tenth Circuit rule applied in Enjady. More importantly, Rule 104(b) does not require corroboration.[8] It only requires that the district court consider the witness's testimony and determine that a reasonable jury could find by a preponderance of the evidence that the asserted sexual assault of that victim by the defendant occurred.[9] This is exactly what the district court did here.

In this case, the district court weighed allegations of four prior uncharged sexual assaults. It admitted the testimony of Jones and Cheneau because their alleged sexual assaults occurred within weeks of one of the charged offenses, Dillon met the women through his position as an ACA, Cheneau's assault happened in a similar manner to the charged offenses, and Dillon offered to use his power to dismiss Jones's traffic tickets in exchange for sex. This evidence was undoubtably prejudicial to Dillon's case. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." United States v. Pace, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (quoting United States v. McRae, 593 F.2d 700, 707 (5th Cir. 1979)). The district court clearly kept this distinction in mind because it excluded the testimony of two other alleged victims. It held that their testimony would have been unfairly prejudicial because those two alleged sexual assaults were remote in time and dissimilar in

---

[8] In fact, to inflexibly so require could run counter to the purpose of the legislation. See 140 CONG. REC. H8968-01, H8992 (daily ed. Aug. 21, 1994) (statement of Rep. Molinari) (noting that this legislation was necessary because the nature of the offense leads most sexual assault cases to become "swearing matches" between the defendant and the victim).

[9] Dillon argues that inconsistences in Cheneau's story, and in prior statements by her, and evidence of phone calls she made to him after the alleged sexual assault severely undermine her credibility. However, we are not at liberty to substitute our own credibility determinations for those of the district court and the jury. Furthermore, Dillon had ample notice of Cheneau's testimony and opportunity to impeach it.

17

their commission to the charged offenses. The district court took great care in weighing the evidence of all these prior sexual assaults. It admitted those that it determined to be relevant, and it excluded those that it determined to be unfairly prejudicial. In making these decisions, we are unable to conclude, under the applicable standard of review, that the district court abused its discretion.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is

AFFIRMED.