# United States Court of Appeals
## For the First Circuit

No. 09-1471

ERIDANIA MARTÍNEZ,

Plaintiff, Appellant,

v.

HONGYI CUI,

Defendant, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Howard, Circuit Judges.

Hector E. Pineiro, with whom Lizabel M. Negrón-Vargas, Robert A. Scott, and Law Office of Hector Pineiro were on brief, for appellant.
Kenneth R. Kohlberg, with whom McCarthy, Bouley & Barry, PC was on brief, for appellee.

June 17, 2010

**LYNCH**, **Chief Judge**.  Eridiana Martínez brought federal and state claims alleging that Dr. Hongyi Cui, a first-year medical resident, sexually assaulted her by digital rape during an examination when she was an emergency-room patient at the UMass Memorial Medical Center.  A jury, after trial, rejected her claims.

On appeal, Martínez alleges there was error in the district court's evidentiary rulings and jury instructions.  The evidence claim raises the relationship between Rule 403 of the Federal Rules of Evidence, which permits courts to exclude relevant evidence on the ground of prejudice or confusion, and Rule 415, which removes the bar on propensity evidence and permits admission of evidence of similar acts of sexual misconduct in civil cases concerning sexual assault.  The instruction claim raises the issue whether the court correctly instructed the jury that Martínez had to show Cui's conduct "shocks the conscience" to prevail on her Fourteenth Amendment substantive due process claim.

We affirm.

### I.

After a car accident on February 10, 2003, Eridiana Martínez was brought by ambulance to the emergency department (ED) at UMass Memorial Medical Center in Worcester, Massachusetts.  Martínez claims Cui digitally raped her, vaginally and rectally, during an examination.  Cui denied that he ever inserted his finger in or examined her vagina, and hospital records supported him.  A

rectal exam was performed, which the parties agreed was medically appropriate. The jury accepted Cui's version and rejected all of Martínez's claims after about an hour and a half of deliberations.

The hospital records and trial testimony established the following.[1] At the ED, Martínez was placed in a cubicle, where she had little privacy. At that time, the ED at the UMass medical center was located in a long hallway, without private rooms, which held treatment areas divided into three cubicles by partial curtains. Martínez could hear patients in adjoining cubicles, only a few feet away, complain of pain.

On admission, Martínez complained of severe pain in her neck and on the left side of her body. She was treated by Dr. Cui, a surgical resident in his internship year, who was accompanied by a Spanish interpreter and, at times, a nurse. According to hospital records (the ED Physician Record), Cui performed an initial trauma evaluation and a physical exam around 2:00 p.m. Cui recorded that a rectal exam and stool occult blood test had been performed on Martínez; he crossed out the line for a vaginal exam on the form because he did not perform one. Cui did not specifically recall this patient, but the jury could have found he recorded information about his own examination of her.

---

[1] In its recitation of the facts surrounding the incident with Martínez, Cui's brief relies almost entirely on a pretrial motion filed in the district court rather than on the trial transcript. The brief recites facts that were not established at trial. The brief was improper in doing so, and counsel is warned.

As an intern, Cui had to be closely supervised by the attending physician. Cui reviewed his exam with Dr. Brush, the attending physician in the ED, who, in turn, performed his own exam and ordered x-rays and pain medication. Brush also wrote an attending note in the ED Physician Record. Martínez was discharged at 3:45 p.m. Before her discharge, Dr. Brush recorded that he had reviewed the ED Physician Record--which said that no vaginal exam had been performed and that a rectal exam had been performed--with Cui and the patient. Martínez also signed the record.

Martínez testified at trial that Cui initially examined her in front of a nurse and translator and then sent her for x-rays. She claimed she was returned alone to her cubicle after x-rays, and Cui returned, also alone. There, Cui lifted her leg, inserted his finger in her rectum and then her vagina, and touched her clitoris. She testified that she did not scream but asked him not to touch her. She also testified that he was drooling during the exam. This encounter lasted about five minutes, according to Martínez, and ended when someone called for Cui.

Several facts presented at trial undermined Martínez's story. Martínez testified that Cui rectally assaulted her once. Yet even Martínez's expert witness agreed that a rectal examination was within the standard of care under the circumstances, though a vaginal examination was not. A rectal exam was called for to determine whether, among other things, Martínez had suffered

-4-

internal or spinal injuries. Consistent medical testimony also was that, to perform a rectal exam while a patient is strapped to a stretcher, three people are needed to help turn and hold the patient on her side. Martínez did not explain how Cui could have assaulted her while she was still on the stretcher without anyone present. Martínez also did not recall seeing Dr. Brush at all that day, nor could she explain the presence of her signature next to his on the ED Physician Record.

Martínez also conceded having testified inconsistently at a deposition. Martínez admitted that she had previously testified that she cried for help during the alleged attack; she insisted at trial (though not in the deposition) that she had done so "quietly." She agreed she had testified earlier, but not at trial, that Cui was biting his lip and "getting off" during the alleged attack. And she admitted that she had previously testified that another patient was in the next cubicle, that she could hear the patients in other cubicles, and that someone from radiology walked into her cubicle during her initial exam with Cui.

In the aftermath of the ED visit, Martínez said, she was so traumatized from Cui's alleged assault that she feared having any form of practitioner treat her who was male. Yet she visited the office of Dr. Ron Tebo, a chiropractor, eighteen times in 2003, beginning just two days after the alleged attack. She tried to reconcile her claim with testimony that Tebo himself touched her

only once and never with his hands.  Martínez was treated by several other male medical personnel in 2003 after February 10 as well.

Martínez did not make any claim of an inappropriate examination to hospital personnel before she was discharged.  Martínez testified that a friend, Mr. Yrure, came into the cubicle shortly after the assault and she reported it to him.  Yrure did not testify at trial, and the judge instructed the jury it could draw a negative inference from the absence of any witness.

Martínez testified that she told her primary care provider, Mary Sullivan, a nurse practitioner, on February 14 over the phone that Cui had assaulted her.  Sullivan testified that Martínez first told her about the alleged assault at the end of an appointment on February 18, rather than four days earlier as Martínez claimed.  Sullivan obtained the ED Physician Record from Martínez's ED visit and went over it with Martínez, who was "upset" and "tearful" when she left.  On March 14, 2003, more than a month after the alleged assault, Martínez first filed a formal complaint with the hospital.  The Board of Registration in Medicine (the Board) was notified.

More than a year later, on May 19, 2004, the Board initiated disciplinary proceedings against Cui based on Martínez's

allegations, as well as allegations by another woman, B.H.,[2] who claimed that Dr. Cui, while still a surgical resident in his intern year, inserted his finger in her vagina during a postoperative exam on March 18, 2003. The Division of Administrative Law Appeals (DALA) conducted exhaustive proceedings, which included discovery and testimony from dozens of witnesses. On January 30, 2007, a DALA magistrate found that Cui had committed no misconduct and recommended that the Board dismiss charges against Cui, which the Board did. The jury was not told this history; it was only informed there had been a prior proceeding.

Meanwhile, on February 6, 2006, Martínez had sued Cui in federal court under 42 U.S.C. § 1983, alleging violations of her rights under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution, as well as several state law claims. Her federal claims alleged that Cui, as a state employee,[3] had violated her right to bodily integrity by sexually assaulting her. The district court appropriately characterized this claim as a Fourteenth Amendment substantive due process claim.

---

[2] We will not use B.H.'s full name due to the personal nature of her illness and treatment. Though B.H. reported to hospital personnel that she felt uncomfortable during Cui's exam immediately afterward, B.H. alleged that Cui inserted his finger in her vagina only after being contacted by representatives of the Board.

[3] Cui was a resident doctor in the UMass health system. The parties stipulated that he was a state employee acting under the color of state law.

Martínez challenges several evidentiary rulings. As to B.H., the court ruled that (a) B.H. could not testify for Martínez about Cui's alleged sexual assault of B.H. and (b) B.H. could not testify as a rebuttal witness that Cui had performed a rectal examination on her without a chaperone.

The court also ruled that the parties could not refer to the DALA proceedings but could mention a "prior proceeding" when necessary. The court further permitted the defense to impeach Martínez using records from her male chiropractor, Dr. Ron Tebo, which showed that she visited Tebo's offices after Cui's alleged attack. But the court did not permit Martínez to present two rebuttal witnesses to undermine these records.

On February 9, 2009, after about an hour and a half of deliberation, a jury returned a general verdict in favor of Cui on all claims, federal and state. The court denied Martínez's motion for a new trial. Martínez timely appealed.

II.

A.          The District Court's Evidentiary Rulings Were Not Error

We review preserved evidentiary objections for abuse of discretion; we affirm if any error did not affect the parties' substantial rights and likely did not affect the outcome of the case. Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 534 (1st Cir. 2009). We review objections not raised in the district

court for plain error. <u>Microfinancial, Inc.</u> v. <u>Premier Holidays Int'l, Inc.</u>, 385 F.3d 72, 80 (1st Cir. 2004).

### 1. <u>B.H.'s Testimony</u>

Martínez argues that the district court should have admitted B.H.'s testimony as evidence of a similar act in a civil case concerning sexual assault under Fed. R. Evid. 415[4] or at least in rebuttal under Rule 607. Martínez preserved only the second objection, and so we review her Rule 415 argument for plain error. Though Martínez asked the district court to admit B.H.'s testimony, she did not ever argue that this testimony was admissible under Rule 415, and so the court did not mention Rule 415 in its rulings.

We conclude that there was, in any event, no error. Rule 415 is entitled "Evidence of Similar Acts in Civil Cases Concerning Sexual Assault or Child Molestation." It provides, "In a civil case . . . predicated on a party's alleged commission of conduct constituting an offense or offenses of sexual assault . . ., evidence of that party's commission of another offense or offenses of sexual assault is admissible and may be considered." Fed. R. Evid. 415(a).

---

[4] Martínez also argues to us, as she did to the district court, that B.H.'s testimony was admissible under Rule 404(b) as evidence of Cui's intent or an absence of a mistake or accident. We uphold the district court's decision to exclude B.H.'s testimony under Rule 403, which resolves her Rule 404(b) and Rule 415 arguments.

-9-

In turn, Rule 403's balancing test permits courts to exclude otherwise admissible, relevant evidence if, inter alia, "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

We start with a few basics. Rule 415, like its counterparts Rules 413 and 414, was enacted in 1994 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320935, 108 Stat. 1805, 2135-37, and became effective in 1995, United States v. Larson, 112 F.3d 600, 604 (2d Cir. 1997). The drafters' purpose was to supersede Rule 404(b)'s prohibition on evidence of like conduct showing propensity in sexual assault cases. See United States v. Meacham, 115 F.3d 1488, 1491-92 (1st Cir. 1997); 2 J.B. Weinstein & M.A. Berger, Weinstein's Federal Evidence § 413.04[1], at 413-10 to -11 (J.M. McLaughlin ed., 2d ed. 2010).

After Rules 413-415 were enacted, the question arose whether evidence admissible under these rules was subject to Rule 403's balancing test for prejudicial, confusing, or misleading evidence. Weinstein & Berger, supra § 413.04[2], at 413-12. We agree with the conclusion, universal among the courts of appeals, that nothing in Rule 415 removes evidence admissible under that rule from Rule 403 scrutiny. See, e.g., Doe v. Smith, 470 F.3d 331, 346 (7th Cir. 2006), abrogated on other grounds by T.E. v.

-10-

Grindle, 599 F.3d 583 (7th Cir. 2010); Seeley v. Chase, 443 F.3d 1290, 1294-95 (10th Cir. 2006); Blind-Doan v. Sanders, 291 F.3d 1079, 1082-83 (9th Cir. 2002); see also United States v. Guardia, 135 F.3d 1326, 1330 (10th Cir. 1998) (collecting cases applying Rule 403 to Rules 413 and 414); Weinstein & Berger, supra § 415.04[2], at 415-12. The intent of the drafters was that evidence under Rule 415 be subject to Rule 403. See Larson, 112 F.3d at 604.

Questions have also been raised about whether Rules 413-415 change how courts perform the Rule 403 balancing tests. See Weinstein & Berger, supra § 415.04[2], at 415-13 to -16 (describing circuit disagreement). That is primarily because evidence that Rules 413-415 make admissible--evidence of similar sexual assaults by the defendant--can well be the kind of inflammatory, unduly complex evidence courts often exclude under Rule 403. See Fed. R. Evid. 403; 23 Wright & Graham, Federal Practice and Procedure § 5416, at 544 (Supp. 2009).

Some appellate courts have imposed external, judicially crafted rules as to district judges' consideration of evidence under Rule 415. Two circuits have required district courts to apply Rule 403 with "careful attention to both the significant probative value and the strong prejudicial qualities" of this evidence. Seeley, 443 F.3d at 1295 (quoting Guardia, 135 F.3d at 1330) (internal quotation marks omitted); see also Doe ex rel.

-11-

Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1268 (9th Cir. 2000). Others seemingly have instructed district courts to apply Rule 403 less stringently, at least in some cases, to avoid having Rule 403 swallow evidence Congress clearly intended to make admissible. E.g., Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 156 (3d Cir. 2002); see also United States v. Seymour, 468 F.3d 378, 385 (6th Cir. 2006); United States v. Gabe, 237 F.3d 954, 959-60 (8th Cir. 2001); Larson, 112 F.3d at 604. Several circuits have adopted factors district courts can or should consider to evaluate the admissibility of evidence under Rules 415 and 403. E.g., Seeley, 443 F.3d at 1295; Johnson, 283 F.3d at 156; Glanzer, 232 F.3d at 1268-69. And at least one has suggested that appellate courts should more carefully scrutinize district courts' decisions under Rules 413-415. See United States v. LeMay, 260 F.3d 1018, 1022 (9th Cir. 2001).

We reject these approaches and have no reason to adopt special rules constraining district courts' usual exercise of discretion under Rule 403 when considering evidence under Rule 415, see Doe, 470 F.3d at 346; see also, e.g., United States v. Dillon, 532 F.3d 379, 388-90 (5th Cir. 2008); United States v. Julian, 427 F.3d 471, 485-87 (7th Cir. 2005), which we will review under the ordinary abuse-of-discretion standard, see Dillon, 532 F.3d at 387.

Of course district courts must apply Rule 403 with awareness that Rule 415 reflects a congressional judgment to remove

-12-

the propensity bar to admissibility of certain evidence. Cf. United States v. Rogers, 587 F.3d 816, 822 (7th Cir. 2009) ("Congress has said that . . . it is not improper to draw the inference that the defendant committed this sexual offense because he has the propensity to do so."). That awareness includes the fact that the Rule 403 analysis also applies. See Fed. R. Evid. 403; Weinstein & Berger, supra § 403.02[1][a], at 403-5. Nothing in the text of Rules 413-415 suggests these rules somehow change Rule 403. See Fed. R. Evid. 413-415 (making some propensity evidence merely "admissible" but not mentioning Rule 403 and indeed cautioning that these rules do not prevent consideration of evidence under any other rule).

As to the ruling at issue, Martínez argues that the district court applied Rule 403 too stringently to B.H.'s testimony and should have accepted her testimony as evidence of a similar sexual assault under Rule 415. Though the court did not consider Rule 415 (because Martínez never argued this point), the court did accept that "if there were two identical or similar instances of the same type of conduct," that evidence would be "arguably relevant" to show Dr. Cui's intent or absence of mistake or accident under Rule 404(b). But it ruled that "there is a great danger of unfair prejudice or confusion here. The trial would be as much about [B.H.] as Ms. Martinez."

The district court went on to explain why it was excluding this evidence under Rule 403's balancing test. The court noted it had the "benefit of a highly developed evidentiary record in the DALA and Board of Registration proceedings," an "unusual situation." Those proceedings revealed two reasons to exclude B.H.'s testimony as potentially unfairly prejudicial and, so, likely to confuse the issues or mislead the jury.

First, there were significant medical distinctions in the two treatment situations that would have required extensive explanation.[5] Martínez was in an auto accident and "whatever trauma she suffered, it was not in her vaginal or anal area." By contrast, B.H. had undergone surgery for Crohn's disease that basically removed her rectum and anus. "Her intestine was rerouted to a colostomy bag, and she had been suffering from substantial leakage of fecal matter and . . . fluid into her vagina." Dr. Cui had to perform a postoperative exam to ensure B.H.'s surgical incisions were not bleeding or infected. B.H., heavily sedated on morphine, claimed that she felt--not that she saw--Dr. Cui insert his finger in her vagina. Expert testimony established that she would have had a hard time differentiating what Dr. Cui was

---

[5] The district court did not say that the insertion of a doctor's finger into patients' vaginas when not medically indicated were dissimilar events. Had there been such a holding, that would be problematic.

-14-

touching, and in any event a vaginal exam would have been appropriate.

Second, B.H.'s testimony would have required "a minitrial," indeed something "in the nature of a maxitrial," to probe the complexity of B.H.'s condition, including expert testimony. The record fully supports the district court's evaluation of the underlying facts, which are in truth even more complicated than the recitation that the court gave. That, in turn, fully supports the court's judgment that Martínez's case could get lost in the details of the "maxitrial," which would have been unduly prejudicial and likely to confuse the issues and mislead the jury. See Fed. R. Evid. 403.

The exclusion of the rebuttal evidence from B.H. is even more easily resolved against Martínez. The district court had allowed Martínez's counsel to elicit from Cui, during cross-examination, that Cui had examined an unnamed patient's perineum without a chaperone. The court could conclude that further testimony from B.H. would require going into a great deal of background that, we have already explained, was collateral to the issues at trial and likely to confuse the jury.

2.     References to a "Prior Proceeding" and Vouching

Martínez next argues that defense counsel prejudiced the jury by essentially revealing that Cui had been previously cleared of misconduct. The district court suppressed references to the

-15-

DALA proceedings and the Board's decision not to discipline Cui. But it allowed counsel to refer to a "prior proceeding" when appropriate. At trial defense counsel nevertheless elicited, without objection from Martínez, that Cui had not lost his license.

As we understand her brief, Martínez argues that the combination of references to a "prior proceeding" and evidence that Cui was still licensed told the jury exactly what the court had excluded: that a prior proceeding had cleared Cui of misconduct. Because she did not object at trial to evidence of Cui's license status, Martínez must show the district court committed plain error by admitting this evidence, which she cannot. See United States v. Torres-Oliveras, 583 F.3d 37, 41 (1st Cir. 2009).

The court's limiting instructions further ensured this evidence did not affect Martínez's substantial rights or undermine the fairness of the judicial process. See id. During trial the district court cautioned the jury that "there were a number of pretrial proceedings in this case . . . where witnesses made statements . . . . The nature of the proceedings is not important. The issue is . . . whether a statement was made." And the jury instructions told the jury to base its verdict only on the testimony it had heard in that trial.

To the extent Martínez tries to avoid her failure to object by arguing, on appeal, that references to a "prior proceeding" were inappropriate (an argument she has preserved),

-16-

this claim is meritless.  The court did not abuse its discretion by concluding that allowing counsel to mention a "prior proceeding" was a sensible, neutral way for counsel to refer to the DALA proceedings when appropriate, such as to impeach witnesses, without telling the jury what happened.

Martínez additionally argues the defense prejudiced the jury by "vouching" for Dr. Cui in opening statement[6] when counsel told the jury, "[Cui] is here in your community.  He is at your service, and I'm proud to represent him."  We bypass whether Martínez waived this objection.

In civil cases, to evaluate allegedly improper conduct by counsel, we examine the totality of the circumstances.  P.R. Aqueduct & Sewer Auth. v. Constructora Lluch, Inc., 169 F.3d 68, 82 (1st Cir. 1999).  We consider "the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties treated the comments, the strength of the case, and the verdict itself."  Id.  And we only reverse "upon a showing of prejudice."  Id.  There was more than adequate basis for the jury to reject Martínez's version of events. despite this comment.

_____

[6]     Martínez also argues that defense counsel's closing argument was prejudicial.  Because she does not point to specific improper statements, this argument is waived.

-17-

3. Dr. Tebo's Records and Testimony Rebutting Those Records

Martínez next argues that the district court should not have permitted the defense to cross-examine her by using records from Dr. Tebo's office. Tebo himself did not take the stand, but his records showed that Martínez received treatment at Tebo's office eighteen times in 2003 starting two days after her ED visit. They were used to impeach Martínez's testimony that the alleged attack by Cui left her unable to see male practitioners.

Martínez argues this impeachment by contradiction was improper because the Tebo records, used for the impeachment, were collateral. See United States v. Lipscomb, 539 F.3d 32, 39 (1st Cir. 2008). A topic is collateral if it is being introduced merely to contradict a witness and does not bear upon a substantive point at issue in trial. See id.; 1 K.S. Broun, McCormick on Evidence § 45, at 215 (6th ed. 2006); see also 27 Wright & Gold, Federal Practice & Procedure § 6096, at 659-62 (2d ed. 2007).

The district court could conclude in its discretion that Tebo's records should not have been excluded as collateral. The heart of Martínez's lawsuit was Cui's alleged sexual assault. Her claim that she feared being treated by male practitioners went to both the credibility of her story and the extent of her damages. Showing that Martínez had visited Tebo's office eighteen times, including two days after the alleged assault, undermined these parts of Martínez's claim.

-18-

The district court also did not abuse its discretion excluding testimony from a Tebo patient who had no knowledge of Martínez's treatment but would have testified that Tebo often had other staff members treat patients. Nor did it improperly exclude testimony from an expert that Tebo's care and record-keeping was improper. The district court allowed Martínez to testify that she did not see Tebo. The testimony from these witnesses would not have enhanced her testimony; the witnesses merely would have challenged Tebo's general practices, an issue collateral to those at trial.

B.        The Shocks-the-Conscience Standard Applies to Claims that an Executive Official's Sexual Assault Violated the Substantive Due Process Clause

Martínez argues that the district court instructed the jury to apply the incorrect substantive rule to her claim that Cui's alleged sexual assault violated her substantive due process rights. We review her claim of legal error in the court's jury instructions de novo. Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010).

The court instructed the jury that Martínez had to prove "that the behavior of the defendant was so egregious and so outrageous, that it may fairly be said to shock the contemporary conscience." Martínez asked the district court to say that Cui's conduct "simply needs to violate a right of bodily integrity." On appeal, Martínez says that she did not need to show that her

-19-

allegations, if true, shock the conscience.  Martínez argues that the instructions should have required no further finding than that there was an invasion of her bodily integrity.

Martínez is wrong, as the Supreme Court established in County of Sacramento v. Lewis, 523 U.S. 833 (1998), if not earlier. Martínez's argument relies on a reading of language in two older First Circuit cases, Brown v. Hot, Sexy & Safer Productions, Inc., 68 F.3d 525, 531 (1st Cir. 1995), and Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991), that parties could establish substantive due process claims either by showing the invasion of an identified right or by showing that an officer's conduct shocks the conscience.[7]  That reading of those cases is not good law, has been superseded by Supreme Court caselaw, and has been rejected, even before this case.  DePoutot v. Raffaelly, 424 F.3d 112, 118 n.4 (1st Cir. 2005).

---

[7]    Brown identified "two theories under which a plaintiff may bring a substantive due process claim.  Under the first, a plaintiff must demonstrate a deprivation of an identified liberty or property interest protected by the Fourteenth Amendment.  Under the second, a plaintiff is not required to prove the deprivation of a specific liberty or property interest, but, rather, he must prove that the state's conduct 'shocks the conscience.'"  68 F.3d at 531 (quoting Pittsley, 927 F.2d at 6) (internal citations omitted).
    Similarly, Pittsley concluded, based on Supreme Court jurisprudence as it stood in 1991, that the "Court has enunciated two alternative tests by which substantive due process is examined. Under the first theory, it is not required that the plaintiffs prove a violation of a specific liberty or property interest; however, the state's conduct must be such that it "shocks the conscience."  To succeed under the second theory, a plaintiff must demonstrate a violation of an identified liberty or property interest protected by the due process clause."  927 F.3d at 6.

Lewis clarified that the shocks-the-conscience test, first articulated in Rochin v. California, 342 U.S. 165 (1952), governs all substantive due process claims based on executive, as opposed to legislative, action. 523 U.S. at 845-46; Mongeau v. City of Marlborough, 492 F.3d 14, 17-18 (1st Cir. 2007); Coyne v. Cronin, 386 F.3d 280, 287-88 (1st Cir. 2004); Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999); accord, e.g., C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347, 591 F.3d 624, 634 (8th Cir. 2010); Ellis ex rel. Estate of Ellis v. Ogden City, 589 F.3d 1099, 1101 (10th Cir. 2009); Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 190 (3d Cir. 2009); Wolf v. Fauquier County Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009); Davis v. Carter, 555 F.3d 979, 982 (11th Cir. 2009); Benzman v. Whitman, 523 F.3d 119, 126 (2d Cir. 2008).[8] But see Grindle, 599 F.3d at 589.

Lewis expressly rejected the notion, which Brown assumed, that rights protected by the substantive Due Process Clause as applied to executive actors are somehow separate from the shocks-the-conscience test. Lewis held that plaintiffs must show, not

_____

[8] That is the conclusion of most commentators as well. E.g., R. Chesney, Old Wine or New? The Shocks-the-Conscience Standard and the Distinction Between Legislative and Executive Action, 50 Syracuse L. Rev. 981, 993 (2000) ("[S]atisfaction of the shocks-the-conscience standard, as employed in Lewis, is a necessary but not sufficient condition for the maintenance of a substantive due process challenge to executive action."). But see R.B. Levinson, Reining in Abuses of Executive Power Through Substantive Due Process, 60 Fla. L. Rev. 519, 546 (2008).

only that the official's actions shock the conscience, but also that the official violated a right otherwise protected by the substantive Due Process Clause. 523 U.S. at 847 n.8; Estate of Bennett v. Wainwright, 548 F.3d 155, 162 (1st Cir. 2008), abrogated on other grounds by Maldonado v. Fontanes, 568 F.3d 263 (1st Cir. 2009); Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006); Rivera v. Rhode Island, 402 F.3d 27, 33-36 (1st Cir. 2005); see also, e.g., C.N., 591 F.3d at 634; Chambers, 587 F.3d at 190.

Lewis justified this two-tiered approach on theoretical and practical grounds. Lewis explained that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," 523 U.S. at 845 (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)) (alteration in original), and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" id. at 846 (quoting Collins v. Harker Heights, 503 U.S. 115, 129 (1992)). Restricting substantive due process on executive official actions also prevents the Fourteenth Amendment from becoming a "font of tort law." Id. at 848-49 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)) (internal quotation marks omitted). Only conscience-shocking behavior can be sufficiently arbitrary and egregious to be of constitutional significance. Id. at 846-47 & n.8. Once plaintiffs have shown a constitutionally significant level of culpability, they then may turn to establishing that a protected right was offended. Id. at

-22-

847 n.8; see also Washington v. Glucksberg, 521 U.S. 702, 719-24 (1997) (outlining how to determine whether the substantive Due Process Clause protects a proposed right).[9]

Lewis's analysis flatly overrules the contrary language in Brown and Pittsley, see id. at 847 n.8, as this court has already recognized, DePoutot, 424 F.3d at 118 n.4.

The conscience-shocking test is now an essential part of any substantive due process claim against a government actor. We held this in DePoutot and have consistently applied that test since. E.g., González-Fuentes v. Molina, No. 08-1818, slip op. at 27 (1st Cir. June 10, 2010); Espinoza v. Sabol, 558 F.3d 83, 87 (1st Cir. 2009); Estate of Bennett, 548 F.3d at 162; Mongeau, 492 F.3d at 17-18; Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 53 (1st Cir. 2006); Pagán, 448 F.3d at 32; McConkie v. Nichols, 446 F.3d 258, 260 (1st Cir. 2006).

Several circuits also hold that plaintiffs claiming that an executive officer's conduct, grouped under the term "sexual assault," violated the substantive Due Process Clause must show the

---

[9]    There is some tension between how Lewis and Glucksberg described the order in which courts should proceed to identify whether a plaintiff has identified a protected right. See Lewis, 523 U.S. at 847 n.8; Glucksberg, 521 U.S. at 720-21.
    We need not resolve this tension, however, because we do not assume that the Supreme Court has required a lock-step, two-part analysis in which the second step in Lewis (identifying a right) cannot take place first. The Court recently rejected a mandatory lock-step, two-part analysis for qualified immunity, see Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), and some of the reasons for its holding would apply in this context as well.

officer's conduct shocked the conscience as part of their claims.[10] We agree. See Cummings v. McIntire, 271 F.3d 341, 342-43, 344-45 (1st Cir. 2001) (applying the conscience-shocking test when a plaintiff alleged an officer shoved him); see also Maldonado, 568 F.3d at 272-73 (opining though not holding that the conscience-shocking test likely applies to deprivations of property). In this case the jury was correctly instructed on the shocks-the-conscience element.

We also note that the jury may well have rejected Martínez's claim because it simply did not believe there was a digital rape, without reaching the shocks-the-conscience inquiry. In fact, Cui's closing argument was devoted entirely to denying that the "rape" ever happened. He urged that it defied common sense to think that an intern would rape a patient--and risk his career in the process--in mid-afternoon, for five minutes, while people were walking in and out of her cubicle and around the busy ED. Counsel also focused on Martínez's credibility, touching on her own inconsistent statements and story, differences between her story and those of other witnesses, and her failure to present

---

[10]    See, e.g., United States v. Guidry, 456 F.3d 493, 506-07 (5th Cir. 2006); Rogers v. City of Little Rock, 152 F.3d 790, 797 (8th Cir. 1998); Lillard v. Shelby County Bd. of Educ., 76 F.3d 716, 725-26 (6th Cir. 1996); see also Wilson v. Luttrell, 230 F.3d 1361, at *9 (Table) (6th Cir. 2000) (applying Lillard after Lewis).
    Some courts have noted in dicta that the shocks-the-conscience test likely applies to sexual assault claims. See, e.g., Williams v. Berney, 519 F.3d 1216, 1223-24 (10th Cir. 2008); Fontana v. Haskin, 262 F.3d 871, 882 & n.7 (9th Cir. 2001).

-24-

supporting witnesses. Cui's closing never even mentioned the phrase "shocks the conscience."

We add a few points of caution. As the <u>Lewis</u> Court noted, whether behavior is conscience-shocking may be informed in some cases by the nature of the right violated. <u>See</u> 523 U.S. at 847 n.8.[11] Martínez's claim that there is some absolute, generalized substantive due process right to the protection of bodily integrity from executive action is simply wrong, however. The Supreme Court has recognized an interest in one's bodily integrity, but it has always defined the scope of that interest against the government's undeniable competing interests in a variety of contexts.[12] <u>E.g.</u>, <u>Cruzan</u> v. <u>Dir., Mo. Dep't of Health</u>, 497 U.S. 261, 278-82 (1990) (balancing a person's liberty interest in refusing medical treatment against the relevant state

---

[11] The precise relationship between the shocks-the-conscience inquiry and identified rights protected by the Due Process Clause is more complex than we need to discuss here. <u>See</u> <u>Lewis</u>, 523 U.S. at 856-58 (Kennedy, J., concurring) (attempting to reconcile <u>Lewis</u> and <u>Glucksberg</u>); <u>id.</u> at 860-62 (Scalia, J., concurring in the judgment); <u>see also, e.g.</u>, <u>Galdikas</u> v. <u>Fagan</u>, 342 F.3d 684, 690 n.3 (7th Cir. 2003), <u>abrogated on other grounds by</u> <u>Spiegla</u> v. <u>Hull</u>, 371 F.3d 928 (7th Cir. 2004); Levinson, <u>supra</u>, at 544-47; Chesney, <u>supra</u>, at 997-1003.

[12] The government regularly regulates in ways that affect a person's body to protect the public interest. <u>See, e.g.</u>, <u>Jacobson</u> v. <u>Massachusetts</u>, 197 U.S. 11, 26 (1905) (upholding compulsory vaccination because, in society, "persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state" (quoting <u>Hannibal & St. J.R. Co.</u> v. <u>Husen</u>, 95 U.S. 465, 471 (1877))).

interests); <u>Washington</u> v. <u>Harper</u>, 494 U.S. 210, 220-27 (1990) (noting an inmate's liberty interest to be free from the state administering unwanted antipsychotic drugs but holding he received all process due in light of contrary state interests); <u>Winston</u> v. <u>Lee</u>, 470 U.S. 753, 758-63 (1985) (balancing, in a Fourth Amendment case, an individual's interest to be free from evidence searches that penetrate the skin with society's interest in that information); <u>see</u> <u>also</u> <u>Breithaupt</u> v. <u>Abram</u>, 352 U.S. 432, 439 (1957) ("As against the right of an individual that his person be held inviolable . . . must be set the interests of society . . . ."). Indeed, Court cases recognizing the "right to bodily integrity" cite cases--including <u>Rochin</u>, the foundational shocks-the-conscience case--that balance bodily integrity against the government interest. <u>Glucksberg</u>, 521 U.S. at 720; <u>see</u> <u>also, e.g.</u>, <u>Vacco</u> v. <u>Quill</u>, 521 U.S. 793, 807 (1997).

To the extent Martínez argues that Cui's examination of her fell below the proper standard of care, she comes perilously close to trying to constitutionalize medical malpractice tort law. Evidence that medical treatment did not meet the standard of medical care is a negligence standard. The Supreme Court has repeatedly emphasized that due process claims may not be used in that manner. <u>See</u> <u>Lewis</u>, 523 U.S. at 848-49 (citing <u>Paul</u> v. <u>Davis</u>, 424 U.S. 693, 701 (1976)).

<u>Affirmed</u>.